GRAY v. PALMER AND EATON, ADMINISTRATORS, et als.—EATON v. PALMER, ADMINISTRATOR, et als.

A decree adjudging that a partnership existed between two of the parties to the action, and that another partnership existed between one of them and another party to the action, each partnership embracing all business and property, both real and personal, of the parties, and deciding that the one partnership is subject to the other, and directing an account to be taken, there being other parties to the action representing the interest of one of the partners in each partnership, is interlocutory, and not final.

Such a decree does not ascertain the specific sum due to any of the partners, nor direct the disposition of the partnership property. It does not settle the *present* condition of the partners, but only the original terms of their partnership.

In the "Act to regulate the settlement of the estates of deceased persons," the words *claimant* and *claim* are used as synonymous with the words *creditor* and *legal demand*. It was not the scope and purpose of this action to establish claims against the estate, to be paid out in due course of administration.

A surviving partner being entitled to the possession and control of the partnership effects, can proceed directly in the District Court to obtain the control, and to have a partition of the real estate belonging to the partnership, but standing in the name of his deceased partner,

It was necessary to file this bill, and make the administrator, the widow, and the infant, parties, to rebut the presumption of ownership on the part of the estate, arising from the fact that the real estate stood upon the record in the name of the deceased, and the administrator had possession of the personal property. These objects could only be accomplished by proceedings in the District Court, as the Probate Court did not possess the judicial means of giving relief.

Where there is but one clerk in the office of a public newspaper, his affidavit of the publication of summons, or notice, in said paper, is sufficient, and it is unnecessary for the affidavit to describe him as *principal clerk*.

The requirement of the statute being positive that in actions against a minor under the age of fourteen years, personal service of summons must be made, in cases where he resides out of this State and his residence is known to plaintiff, such residence should be stated in the affidavit for publication.

The failure to deposit in the post-office a copy of the complaint and summons, directed to such minor, is not cured by the appearance of the mother in her own behalf.

The Court has no right to appoint a guardian *ad litem* until the infant is properly brought into Court.

A partnership may exist in the purchase and sale of lands, but such a partnership can only exist where the contract is reduced to writing. It is not necessary that the partners should be jointly concerned in the original purchase, where the interests of the partners are afterwards mingled; but they must be jointly concerned in the future sale.

It does not matter in whose name the real estate is held; he is only a trustee for the partnership; and for the purpose of disposal and distribution, it is to be treated as personal estate.

This being the true character of partnership real estate, the surviving partner has an equitable lien upon it for his indemnity against the debts of the firm, and for the balance due him.

There may be a dormant partnership in the purchase and sale of real estate as between the partners themselves, but as between the partners and third persons, the law in regard to dormant partners will not apply.

Parties may form a universal partnership, but the same would not be held to exist, unless the intention was clearly expressed. The evidence to establish such a partnership, after the death of one of the alleged partners, should be clear and full, and not subject to doubt.

APPEAL from the District Court of the Fourth Judicial District, County of San Francisco.

A motion was made on the part of counsel for respondent Gray, to dismiss this appeal, on the ground that the appeal was not taken in time. The first decree was entered some time in the year 1855, probably in October, but it is not certain, as there is no date to the decree. The actions were consolidated October 24, 1855, and the decree seems to have followed directly after the order of consolidation. The second decree was made on the twenty-first day of November, 1856. The notice of appeal was filed in the Court below, October 7, 1857.

[As this Court has disposed of the motion, and the case, in one opinion, no separation of the briefs of counsel, on this motion, is deemed necessary.—REPORTER.]

This was a suit in equity, (consisting of two separate actions, here consolidated in one,) for the dissolution of a copartnership, partition of the partnership property, and an adjustment and payment of the debts of the concern.

The facts are as follows :

On the fifteenth of July, 1853, Franklin C. Gray died in the State of New York, leaving there a wife, Matilda C. Gray, and a posthumous child, Franklina C. Gray. This wife and child are the appellants here.

He also left in California real and personal property, appraised, in the Probate Court of San Francisco, at over two hundred and thirty-seven thousand dollars.

On the eighteenth of February, 1854, William H. Gray, a brother of the decedent, residing in San Francisco, commenced the first of the above actions against the estate. His bill alleges the existence for some years, of a partnership between himself and the decedent, the death of the latter, and the appointment of Joseph C. Palmer and Cornelius J. Eaton, as administrators.

The allegations of the bill respecting the partnership, are as follows :

" That about that period the said Franklin, on account of some domestic troubles, was desirous to go off upon a long journey, and as the plaintiff had before then been for some months in the Mexican republic, the said Franklin proposed that they should go upon a trading expedition on their joint account, to Santa Fe and Chihuahua, in New Mexico, and then through Mexico generally ; one of the inducements to said enterprise being that the plaintiff was familiar with the language, manners, and customs, of the Mexican people. After some negotiation the agreement was made as proposed, and the understanding was, that they were to set out early in the ensuing spring. In the meantime, the said Franklin having business at Washington, went there to adjust it, and whilst there the rumors of discovery of gold in California were confirmed ; whereupon the said

Franklin at once wrote to the plaintiff, that California was the proper field for their intended operations, and that he would at once embark from New York for Chagres and that the plaintiff must make arrangements to meet him either at that point, or, if possible, at Havana. On the receipt of the letter the plaintiff at once proceeded to wind up his business at St. Louis, and in January, 1849, arrived at New Orleans on his way to California *via* Panama. But on his arrival at New Orleans, hearing that there was little or no prospect of obtaining transportation from Panama, on account of the crowd of passengers then assembled there, he retraced his steps to St. Louis, and in the Spring of 1849, set out across the plains of California, arriving here in October of that year. On his arrival he met said Franklin, who had then been here about four months, which time he had employed profitably, and during that period had earned and realized a considerable sum of money. He gave the plaintiff a full account of his operations, and distinctly stated that, regarding their previous arrangement as in full force, he (the plaintiff) was justly and fairly entitled to one-half of all that he (Franklin) had acquired in California, up to that time, and that thenceforth all their operations in California would be upon joint account; and that all profits and losses in their business should be equally divided between them.

"But the plaintiff proposed that inasmuch as the said Franklin had already accumulated a handsome capital without his (the plaintiff's aid, he (plaintiff) would be content with one-third instead of one-half interest in the fund already on hand, and their future acquisitions. To this, said Franklin at once distinctly assented, and immediately drew up, executed, and delivered to the plaintiff, a written stipulation to that effect, setting forth explicitly that the plaintiff was entitled to one-third of all the acquisitions of the said Franklin, in California, up to that period, and that in all their subsequent business transactions in this State, of whatsoever nature, they were to be jointly interested—the plaintiff to the extent of one-third, and the said Franklin two-thirds. It was then agreed that they were to open a commercial house in San Francisco under the firm and style of F. C. Gray & Co., which should be chiefly under the control and management of the plaintiff, whilst the said Franklin would devote himself to other pursuits for their joint benefit. The commercial house was accordingly opened, and continued to be conducted by the plaintiff until a recent period, he having put into the concern of his own money about nine hundred dollars in addition to that furnished by said Franklin. They proceeded in business prosperously, and by their joint efforts and industry increased their capital and means rapidly, the management and control of which was entrusted almost exclusively to the said Franklin, in whom the plaintiff had the most implicit confidence.

They embarked extensively in real estate operations and in other business enterprises which were conducted exclusively in the name of said Franklin, notwithstanding the plaintiff was interested to the extent of one-third in the whole of them, as hereinbefore set forth.

" In this manner the said Franklin bought and sold real estate, taking the titles in his own name, though for their joint benefit, and engaged in other lucrative enterprises, from which large profits were realized, and which were conducted in the sole name of said Franklin, though, with their joint capital, and for their joint advantage, and on their joint account. By these means, they succeeded in accumulating a large estate, consisting of houses and lots in the city of San Francisco, lands in other portions of the State of California, debts, and moneyed demands due them, and a large sum in ready cash : to one-third of all of which, the plaintiff was and is justly entitled, by virtue of the partnership agreement aforesaid."

The bill also set out the destruction of the articles of copartnership by fire.

He annexes to his complaint a schedule of the estate, and asks " that one-third of the same be adjudged and decreed to belong to him, under said partnership agreement, and that partition thereof be made, between himself and the defendants."

Publication was made of the summons, and the order of Court directed a copy of the summons and complaint to be deposited in the post-office, directed to the infant daughter, and to the care of the mother. Upon the petition of the plaintiff, a guardian *ad litem* was appointed for the child. This guardian also appeared as attorney for the widow, and filed answers for each, admitting the appointment of the administrators, but denying the other allegations of the complaint.

On the fifth of January, 1855, the cause came on, and special issues were sent to a jury for trial. Eleven jurors were empanneled, who found a verdict for the plaintiff upon each issue.

In February, a motion was made for a new trial, which was denied; subsequently, an appeal was taken from the denial of this motion, which was dismissed, because the Chancellor was not bound to enter a decree in accordance with the verdict, and no decree had been made, from which to appeal.

No further steps were taken in this action until October 23, 1855; meanwhile, Cornelius J. Eaton, the former clerk of the decedent, and, as one of the administrators, a defendant in the above action, in April, 1855, commenced the second action against the estate.

His complaint and proceedings were, substantially, the same as those of Gray, in the first action. He differs from him, in claiming, as partner, one-fourth, instead of one-third, of the estate.

The instrument under which he claims to be a partner is set forth in the complaint, and is as follows :

" This indenture, made and entered into this first day of January, A. D. 1851, by and between Franklin C. Gray, party of the first part, and Cornelius J. Eaton, party of the second part, both of the city of San Francisco, State of California, witnesseth : That the said party of the first part, for and in consideration of the following conditions, and for the further consideration of the sum of one dollar to him in hand paid, by the said party of the second part, the receipt whereof is duly acknowledged, hath this day granted, bargained, sold and delivered to the said party of the second part, the undivided one-fourth right and interest in, and to, all the property, both real and personal, of which the said party of the first part, is now possessed, or may hereafter be, within the time for which this instrument is executed.   The conditions are as follows, to wit :

" 1. The said Eaton agrees and binds himself to remain with the said Gray for the term of two years from the first day of January, A. D. 1851, at which time a division of all property, real and personal, shall take place, unless both parties should wish to remain longer together; that is to say, one-fourth to the said Eaton, and the remaining three-fourths to the said Gray.

" 2. The said Eaton shall unite all the funds he may become possessed of, in the joint fund, for the purpose of accumulation.

" 3. All outstanding debts shall be paid out of the joint fund, held against the said party of the first part.

" 4. Both parties to this instrument shall have the privilege of visiting the States, and all the expenses incurred shall be charged to the party so making them, and settled at the expiration of said term.

" 5. Should the connection be dissolved by the death of either of the parties, the affairs shall be closed in the following manner : If dissolved by the death of the said Eaton, his heirs shall receive from the said Gray the sum of one thousand dollars per month for his services, from the first day of January, A. D. 1851, until the time of his decease ; and if by the death of the said Gray, the said Eaton shall, for settling up the estate of the said Gray, receive the full amount of this contract, as fully as if the time had been completed.

" In witness whereof the said party of the first part has hereunto set his hand and seal, on the sixth day of September, A. D. 1851.                    F. C. GRAY.   [SEAL.]

"Attest : JAS. C. L. WADSWORTH."

Neither the complaint of Gray, nor of Eaton, contains any allegation that the claim made therein to a portion of the estate was presented to the administrator before suit was brought.

An order of publication was made in this case, but the order did not direct a copy of complaint and summons to be deposited in the post-office, directed to the non-resident defendants.

When the time requisite for publishing the summons of Eaton had expired, and on the twenty-third of October, 1855, all the parties to both actions, by their respective attorneys, signed a stipulation to consolidate these two actions into the one now before the Court; and four days afterwards a joint decree was entered in the consolidated action.

This decree decided that a dormant partnership existed between William H. Gray and the deceased; and that another one, separate and distinct, co-existed between Cornelius J. Eaton and the deceased; that Eaton should take one-fourth of the estate, and Gray one-third of the remaining three-fourths, (that is to say, another one-fourth,) leaving the remaining two-fourths to be divided between the widow and child. The decree also ordered a reference to take the partnership accounts; a sale of the entire estate, and a division of the proceeds.

Under this decree a sale was made of the estate. On the twenty-fourth of November, 1856, the final decree was entered, confirming the sale of the real and personal property, and rendering the above-mentioned judgment in favor of William H. Gray.

A decree was subsequently made to pay the debts. From this final decree, and all interlocutory orders and decrees, the widow and child, by another attorney and another guardian *ad litem,* appeal to this Court.

*Philip G. Galpin* for Appellants.

That this appeal is not too late, will appear:

1. From the decisions under the former chancery practice.

· 2. From the provisions of the Practice Act.

It is contended that the decree of October 27, 1855, was not an interlocutory, but final decree, from which it is now too late to appeal.

Five authorities are cited upon this point, which are wholly inapplicable, for two reasons:

1. In all of those cases the appeal had been taken from an order or decree, which settled the merits of the case, leaving only ministerial acts to be performed by the clerk. As all the questions to be decided on the appeal grew out of such order or decree, and the proceedings prior thereto, they could well be determined by the Court upon the appeal. For the purpose of upholding the appeal, and thereby saving a second one, which would, in fact, be useless, as it could not review such ministerial act, the Appellate Court properly held such decrees final. ' But this is by no means decided, that if a decree settles the principles of a case, and refers it to a Master, to take an account and report, and when a party, instead of appealing from such order or

decree, chooses to wait until the amount of indebtedness has been fixed, and a proper final judgment for that amount entered, and when he then appeals from such final judgment, that his appeal ought to be dismissed.

In fact, that a party has the right to adopt the latter course is expressly decided in the Steamboat New England, 3 Sumner, 495.

Now, if the Court would not dismiss the appeal from the final decree, when not too late to appeal from the interlocutory one, how much less would they do so, if, as in the present case, it is too late to appeal from such interlocutory decree ?

We have a precisely parallel case in Cooke *v.* Gilpin, 1 Rob., (Va.) 20 : "In a suit by a partner against his copartner, for a settlement of the partnership accounts, and for a moiety of a tract of land purchased with partnership funds, and conveyed to the defendant alone, a decree was pronounced declaring the land partnership property, and directing an account.

Upon a hearing, upon the commissioner's report coming in, the Court decided the balance found due the plaintiff, by the report, to be paid by the defendant, and that the plaintiff should convey a moiety of the land to the defendant, on payment of such balance, but, in default of such payment, directed such moiety to be sold, and out of the proceeds, after paying expenses, to pay such balance to the plaintiff : the decree also directed the outstanding debt to be equally divided between the parties.

Held, that this decree was interlocutory, and not final, and that on appeal from a subsequent final decree, it could be revised by the Appellate Court, although the lapse of time before taking the appeal would have precluded its reviewal, had it been a final decree.

2. None of the cases are in point, because, in · all of them, the acts to be performed subsequent to the decree were purely ministerial, while, in the present case, the decree devolved upon the master the judicial duty of deciding upon the legality and admissibility of the items of account presented.

It is said by Justice Sutherland, in Kane *v.* Whittick, 8 Wendell R., 226, that "no case can be found in which a decree directing a reference to a Master, has been held a final decree."

It is said that an account was ordered to be taken in Weatherford *v.* James, 2 Ala., but a careful examination of the case will show that the clerk was ordered merely to compute the value of the estate of a tenant by courtesy, in a fee valued at eight hundred dollars. This was purely a ministerial act.

In Travis *v.* Waters, 12 Johnson, 500, the decree from which the appeal was taken was entered upon the report of the master after the account had been taken; nay more, it was upon this very ground that that decree was held final. This decision is,

then, directly in our favor.   See Travis v. Waters, 17 John., 508–9.

The case in 3 Cranch, 179, and 13 Peters, 6, are distinguished from this case by the decision in the Palmyra, 10 Wheaton, 502, and Chace v. Vasques, 11 Wheaton, 429.

The balance found due by the master in this case, and for which a decree might be entered, was exactly like the amount of damages in those cases for which a decree might have been entered.

The case in 1 Monroe is also reviewed in Hax v. May's heirs, 1 J. J. Marsh, 497.

Any decree directing a reference to a master to take an account, and ordering him to report to the Court, is not a final but an interlocutory decree.   2 Atk., 385; Kane v. Whittick, 8 Wend., 219; Jaques v. Meth. Epis. Ch., 17 Johnson, 558; Cocke v. Gilpin, 1 Rob. Va., 20; Goodwin v. Miller, 2 Mun., 42; Templeman v. Steploe, 1 Mun., 339; Mackey v. Bell, 2 Mun., 523; Creiger v. Douglass, 2 Coms., 571; Perkins v. Fourniquet, 6 How. U. S., 206.

1. That because these respondents, being holders of claims against an estate, have neither of them alleged nor proved the presentation, to the administrator, of their respective claims, before suit was brought; they have not placed upon the record, nor proved upon the trial, sufficient facts to constitute a cause of action.

The words of the statute are, "no holder of any claim against an estate shall maintain any action thereon, until the claim shall have been first presented to the executor or administrator." Rev. Laws of Cal., 396, § 136.

2. Are the respondents "holders of claims?"

It is a truism which requires no demonstration, and receives no additional strength from the sanction of judicial decision, that the meaning of a statute is the meaning of its component words. Newell v. The People, 3 Seld. Rep., 97, subsequently approved in McCluskey v. Cromwell, 1 Kernan Rep., 602.

To ascertain whether the respondents are "holders of claims," it is only necessary to investigate the meaning of the word "claim."

Says Ch. J. Nelson, in 2 Hill, N. Y. Rep., 223, "the word claim is of much broader import than the word debt, and embraces rights of action belonging to the debtor, beyond those which may appropriately be called debts."

How broad the import of the word is, may be seen from the following authorities:

"The word claim (Latin clamor) signifies a call, a demand, and implies a right, or supposed right, in the claimant, to something in another's possession, or power.   It may be made by words, by suit, or other means."   Webster's Dic.

Burrill, and Bouvier, relying upon Plowden, and Sherp-

herd's Touchstone, define a claim to be, "a challenge, by any man, of the property or ownership of a thing which he has not in possession, but which is withholden from him unlawfully."

Justice Story, in the 16th Peters R., 539, 615, says: "a claim is a demand of some matter, as of right, made by one person upon another, to do, or forbear, some act, or thing, as a matter of duty."

Justice Tilghman, in the 9th Serg. & Rawle Rep., 124, says: "the word demand is very comprehensive, and includes everything a creditor would have a right to recover by suit;" but, says Lord Coke, "the word demand is the largest word known to the law, save only claim, and a release of all demands discharges all rights of action." Co. Litt., 291; Litt., § 508; 8 Co., 553; Bac. Ab., Tit. Release, 283; 1 Denio, 277, 261; Ellissen v. Halleck, 6 Cal. R., 386; McCann v. Sierra Co., 7 Cal. R., 281.

Having shown, from all authority, that the word claim embodies a definite meaning, which includes every right of action, we will now demonstrate that the plaintiffs' hypothesis, "that the rights of action sought to be enforced in these suits, are not claims," involves an absurdity.

The Court never had jurisdiction over the person of Franklina C. Gray.

In a note to the third edition of the New York Code, 127, § 135, it is said, "It is the uniform and unbroken course of decision, that under all statutes which authorize the substitution of some other means, for personal service of process, as a foundation for the jurisdiction of the Court, the most exact compliance with those requisitions will be enforced. Unless such compliance be shown affirmatively, the proceedings will not be sustained." 3 Sme. & M., 645.

See, also, Voorhies Code, 128, § 135, various cases, in which the affidavit of service was held defective.

In the case of Gray v. Eaton, the service was by publication, and the plaintiff was ordered to deposit a copy of the summons and complaint in the post-office, addressed to the infant. The object of the provision of the Practice Act, under which this was done, was to compel the plaintiff to give, in good faith, the best notice he could to the defendant, of the commencement of the action.

The affidavit of publication was not made by the principal clerk, the printer, or foreman. Pr. Act, § 33.

In Eaton v. Palmer, the order for publication does not appear to have been either signed, filed, or entered, and contains no direction to deposit a copy of the summons and complaint in the post-office, etc. The affidavit on which it is obtained shows that the infant resided in the State of New York. It should either state where, in the State, it resided, or that the deponent did not know.

Again, the affidavit of publication was made by a book-keeper.

Nor is the appearance of the infant, by a guardian *ad litem*, appointed upon the petition of the plaintiffs, any waiver of a regular service.

In fact, such a guardian can not be appointed until service has been made.   Pr. Act, § 10.

3. The complaints do not allege the existence of such a partnership as entitle the plaintiffs to file a bill in equity, as partners; but even if Gray may do so, Eaton can not; nor can the latter, in any event, recover upon his complaint.

In the case of Gray *v.* Eaton et al., the complaint shows the existence of two distinct branches of business—the one, a commercial house, conducted in the name of F. C. Gray & Co.; the other, the real estate business and financial speculations of F. C. Gray conducted by him in his own name.

The plaintiff claims, not as a partner in the commercial house of F. C. Gray & Co., but as a general partner in and joint proprietor of all the business, and all the speculations, and, consequently, of all the acquisitions of his brother.   The claim of Eaton is the same.

Now, *first*, it is essential to a partnership that it should have for its subject-matter some business, trade, or adventure.

It appears to be claimed, by each plaintiff here, that this was not a general partnership, which extends to the gains, earnings, and profits, of some business, but it was a universal partnership, in which the parties share, not only the profits, but the capital itself; and of these partnerships, it is said, in U. S. Bank *v.* Binney, 5 Mason R., pp. 176, 183, " there is probably no such thing as a universal partnership, if by the terms we are to understand everything done, bought, or sold, to be deemed on partnership account."

We say that the common law has never as yet recognized a universal partnership.   The mere agreement of two parties to put all their worldly effects together, and to divide, in certain proportions, the income or the profits, may make them tenants-in-common ; and perhaps would give them, as such, the right to an accounting, and to a partition, but it would not make them partners.   3 Kent Com., 25.   Neither of them would have the powers and privileges of partners over the undivided whole; neither of them could bind the other by note or otherwise.   He could only affect by his acts the joint property to the extent of his own interest, no more.   Such a partnership may be recognized in the laws of France and Spain, but it is yet unknown to the law merchant of England.   3 Kent, § 30.

*Second*—In this trade, business, or adventure, which forms the subject-matter of the partnership, there must be some mutuality. Dwivel *v.* Stone, 30 Maine, 386 ; Collyer on Partnerships, p. 113 § 123.

The profits must be accumulated by joint capital, or labor, or both.

If a carpenter and a tailor agree, between themselves, that they will each continue, as theretofore, to carry on his own business, without the assistance of either capital or labor from the other, but that they will put their profits into a common stock, and divide them—this, of itself, does not constitute a legal partnership. A note given by either would not bind the other, nor would the property of either be liable for the debts of the other; they have not the powers of partners over each other, and the law does not recognize them as such. Chase v. Barret, 4 Paige Ch. R., 159; 15 Johns., 422; 21 Black., 244.

*Third*—It is said, in Mitchell v. Dahl, 2 Har. & Gill, 159, and Kelley v. Hurlburt, 5 Cow., 534, that every person is a dormant partner who is not mentioned in the firm, or embraced under the general terms, in the name of the firm or company. Now, in the present case, there is an allegation that the business of purchasing and selling real estate, was carried on in the name of F. C. Gray.

Each complaint then sets forth the existence of a dormant partnership, in the purchase and sale of real estate, but such a partnership has never been recognized, as yet. Story on Part., § 83.

Thus, for example, the ordinary doctrine of the liability of dormant partners does not extend to partnerships formed for speculations in the purchase and sale of lands, citing Pitt v. Waugh, 4 Mass., 424; Smith v. Burnham, 3 Sumner, pp. 435, 470.

It seems that even as third parties, there can be no such thing as a dormant partnership in the purchase and sale of real estate; and if not, how much less can such a partnership be held to subsist as between the parties themselves; they may be tenants-in-common of the realty, but as commercial partners, seeking an accounting, they can have no standing in Court.

But even if the complaint of W. H. Gray alleges the existence of a legal partnership, it is certain that that of Eaton does not.

This complaint sets out the existence of a paper, which is alleged to constitute a contract of partnership. This paper is annexed to, and made a part of, the complaint.

We here lay out of the case all questions as to whether Eaton has rights, as a tenant-in-common, of the property, or not, but we say he has no rights as a partner, for four reasons :

*First*—Because, as we have attempted to show heretofore, the law will not, as between the partners, recognize or enforce, as a legal partnership, an agreement to share all of any person's property, and its accumulations. There must be a union of capital and labor, for the purpose of carrying on a legal trade, business, or adventure.

*Second*—But in any event, this was not an agreement for a

partnership, but simply a conditional sale to Eaton, of one-fourth of the property, at the time owned by Gray, together with its accumulations. Chase v. Barret, 4 Paige Ch., 159.

*Third*—The consideration for this conditional sale was the services agreed to be performed by Eaton, during the existence of the contract, (for which time "he was to remain with the said Gray,") and, also, his services after the death of Gray, in "settling up the estate of the said Gray," for which he was "to receive the full amount of his contract, as fully as if the time (of two years) had been completed."

But the first portion of the fifth condition clearly shows that this agreement was not for a partnership, but for a remuneration for the services of Eaton.

The fifth section says—not, "if this partnership," but, "if this connection be dissolved by the death of Eaton, his heirs shall receive from the said Gray, the sum of one thousand dollars per month for his services, from the first day of January, 1851, until the time of his decease."

Now, even if Eaton was to receive a portion of the profits of the accumulations, he was not, for that reason, of necessity a partner.

If he received it as a compensation for remaining with Gray, and for settling his estate after his death, he was not a partner, even as to third persons, much less as between the parties. 3 Kent Com., 33; 1 Smith Lg. Cases, 832; Collyer on Part., 23; Muzzy v. Whitney, 10 John. R., 228.

Eaton can only be held a partner as to third persons, on the ground that, having taken from the creditors a portion of the profits, he ought to be held responsible, also, for his proportion of the loss; but as between the parties this reasoning does not apply. Waugh v. Carver, 2 H. Bl., 235.

*Fourth*—The contract was inequitable, and ought not to be enforced against holders of the legal title, at least until Eaton, by showing that he has put some capital or labor into the concern, discloses an equity superior to theirs. Chamberlain v. Thompson, 10 Conn., 343.

4. The decree was contrary to the weight of evidence.

Under the decisions in Pitt v. Waugh, 4 Mass., 424, the whole evidence in this case is inadmissible, because the law merchant, relative to dormant partners, does not extend to speculations in land. Story on Part., § 83.

5. The decree was erroneous, because it was entered against an infant by consent, and no day in Court is given her, after she comes of age, to show error in the decree.

We have previously seen that the guardian *ad litem*, for the child, in each case, was appointed upon the petition of the plaintiff.

This guardian, appointed to protect the interests of the child,

consents to the entry of a decree against her. It may well be questioned whether a guardian, appointed by the Court, on the petition of the plaintiffs, has any right or power to give such a consent, and whether a decree entered upon it, ought not to be reversed; but in the present case, not only is the decree entered by consent, but it even deprives the infant of her inheritance, without giving her a day in Court.

This is not simply a partition-suit, to divide property admitted to belong to an infant, jointly with others, but a suit, first, to establish a title adverse to that of the infant; then, under pretext of a partition, to procure a sale of the entire property. There can be no question but that, if the plaintiffs elect to sell this estate, not in the Probate Court, under the provisions of the statute, but under the decree of the District Court, acting as a Court of Chancery, they should have made their decree conform to the chancery practice.

We should have had our day in Court, and Eaton should have been compelled to prove his case. This omission entitles us to a reversal of the decree. Bullit v. Bullit, 4 Bibb, N. Y., 11; Mills v. Dennis, 3 John. Ch. R., 367; Kelsal v. Kelsal, 2 Mylne & Keen, 409; Con. En. Ch., 62; Wilkinson's Adm. v. Oliver's Rep., 4 Hen. & Munf., 450; Glaze v. Dayton, Des., 109; 5 Metcalf, 76; 11 ib., Whitney v. ———.

*Crockett, Baldwin & Crittenden,* for Respondent W. H. Gray.

A motion was made on the trial to dismiss this case, because the appeal was not taken in time. The judgment, or decree, defining and settling the rights of these parties, was made nearly two years ago; the subsequent orders were merely auxiliary, reposing ministerial duties, to carry out this decree. The definition of a final judgment is a judgment that settles the merits of a case. The Supreme Court of Alabama, in Weatherford v. Jones, 2 Ala. Rep., 176, in which case a decree was made, with a reference to the Master, for an account, etc., holds that a decree is final which ascertains the rights of the parties in litigation; and when acts are to be done, as the decree points out and settles the principles by which these acts are to be regulated, they are, in their character, ministerial. See, 12 Johns., 500; 1 Monroe, 137; 13 Peters, 6; 3 Cranch, 179.

The contrary rule might lead to ruinous delays, for a case might be continued after a decision of the merits of it for many years, from some merely formal final order, and then an appeal be taken nominally from the last judgment, but really from the operative judgment.

1. It is objected, on behalf of the appellants, "that, because the respondents, being holders of claims against an estate, have neither of them alleged nor proved the presentation to the administrator of their respective claims before suit was brought,

they have not placed upon the record, nor proved upon the trial, sufficient facts to constitute a cause of action, nor to give the Court jurisdiction over the subject-matter, and that this defect is not waived or cured."

This objection is fully met in all its parts by the simple proposition that William H. Gray asserted no claim against the estate of F. C. Gray, deceased, within the meaning of the statute of this State.

If this be so, he was of course under no obligation to make any application to F. C. Gray's administrator before commencing his action, nor would his failure to do so, and to allege the fact, and prove it, give rise to any of the questions so fully and learnedly discussed by the appellants' counsel under this head.

If his first inquiry, "are the respondents holders of claims?" be answered in the negative, the whole point, with all its incidents, is disposed of.

We have no hesitation in so answering it, upon the manifest meaning and intention of the Statute to Regulate the Settlement of the Estates of Deceased Persons, §§ 128, 131, 133, 139, 147, 222, 150, 228, 249.

The object of the suit is to establish the fact that the property is not the property of the estate, but is partnership property, and the complaint of the plaintiff not only prays, as stated in the appellants' brief, "That one-third of the same be adjudged and decreed to belong to him, under said partnership agreement, and that partition thereof be made between himself and the defendants," but in addition, "that said copartnership be adjudged to be dissolved, and the accounts. thereof be finally adjusted and settled according to the rights of the copartners, and for such other and further relief as in equity and good conscience he is entitled to."

It is true, the administrator of F. C. Gray is made a party defendant, but he is sued, not for the purpose of subjecting the property of the estate in his hands to the payment of a debt due from the intestate, but to take out of his hands property of which he has unlawfully acquired the control; property which does not belong to the estate, and to subject it to all the prior claims to which it is liable as partnership property.

The proposition on which the whole case of the plaintiff rests, is that the estate had no interest in the property, except that which might remain after the partnership affairs were settled. If the partnership did in fact exist as alleged, then properly only the interest of the deceased partner, F. C. Gray, in the property, should have appeared in the inventory of his estate, and only that interest would be represented by his administrator.   That interest might be appraised, but its actual value could be ascertained upon the final settlement of the affairs of the firm, and that settlement the surviving partner had the right to make,

subject to the liability to account to the administrator.   See section 198 of same act.

It may be remarked here that the failure to keep this in view is calculated to present an erroneous aspect of the whole case. Throughout the brief of appellants, it seems to be intimated, if not directly assumed, that all the property was the property of the estate. The very question to be determined in the case of W. H. Gray *v.* Palmer and others, was whether it was the property of that estate, or the property of a partnership, and like other partnership property, to be subjected to the payment of partnership debts.

2. It is further objected by the appellants, that "the Court never had jurisdiction over the person of Franklina C. Gray," because the service of process on her was defective.

The affidavit of publication is made by L. Humphreys, "clerk;" which clearly means sole clerk in the office.   If he had styled himself *a* clerk in the office, there might be some room for objection, as in that case he might have been a subordinate and not the principal clerk.   But the terms *clerk* and *the clerk* implying that he was the only clerk, show necessarily that he was the person intended by the statute; the object of which was, that the affidavit should be made by some one in the office, who, from his position, was presumed to have a knowledge of its business.

3. The third proposition is, that the complaints do not allege the existence of such a partnership as to entitle the plaintiffs to file a bill in equity as partners.

It is not at all material to inquire whether there can be such a thing as a universal partnership.   We can not see, however, if parties choose to make such an arrangement, what principle of law forbids it?   The bill charges, that for considerations therein recited, the parties agreed that money made or property acquired in California, as well in a commercial business established by them, as the purchase and sale of real estate, they were to be equally interested, as in all other business enterprises.   We are not aware that it has ever been held, that if A and B agree to go into general business on joint account, such agreement would not be binding, or if the agreement were executed, that the rules governing partnerships would not apply.   The case in 5 Mason maintains no such doctrine—nor any other case or authority cited.   In order to constitute a partnership, there must be community of profits and losses; but we supposed whenever this existed, however small or extensive the business, it mattered not how many or how few were the subjects or objects of the copartnery, it was technically and legally a partnership.

Story on Partnership, § 92, p. 135, states the rule, which is a sufficient reply to all the remarks of the appellants' counsel in this respect.

As to mutuality, in every partnership the rights and obliga-

tions are mutual. In this, the contract as well bound plaintiff as F. C. Gray; and the consideration was this mutual agreement: both were to give their services, etc., and each was to get a given share of property and profits. Something is said about "dormant partners;" but the relevancy is not perceived; nor is it admitted that there could not be a dormant partner as to real estate, as well as anything else. But here the allegation is, that this firm did business under the style of F. C. Gray & Co., and that the business of the firm embraced the purchase of real estate, etc.; that the real estate was purchased in the name of F. C. Gray; but this did not make the real estate the property of F. C. Gray, any more than if a bale of goods was bought in the name of W. H. Gray, it became his individual property.

Issues were sent to the jury, who found for the plaintiff. A motion was made to set aside this finding, which was denied by the District Judge. After this, the case was submitted, on the papers, to the Court, and a final decree rendered from which the appeal is prosecuted. It is alleged, that this decree was rendered by consent. The record does not so state, and we are not aware of any rule of law which allows the argument or statements of counsel at the bar to be given in evidence to qualify, much less to contradict a judgment or decree. But even if the counsel for defendants, seeing or thinking that the case could not be further defended, agreed to a decree, we by no means admit that the decree, for this reason, loses any of its force. It must be matter of discretion on the part of counsel, to consider how far, or whether, and in what mode, they will conduct or defend a cause; and this rule applies to attorneys of infants, or of guardians *ad litem*, as well as all others; and we have been referred to no authority which declares otherwise.

4. The decree contrary to the weight of evidence. First, we say that the finding of the Court upon the facts is entitled to great consideration by the Appellate Court, and will not be disturbed, unless there be a decided preponderance of testimony the other way. Besides this, we have a verdict of a jury upon the evidence. It is true, that it has been held in this Court in this case, that the verdict is not conclusive. But it is entitled to some weight, else there would be no necessity for it. It may well be doubted whether in a chancery case, under our practice, an issue found by a jury was not designed to have more weight than an issue under the old chancery system. Sec. 9, p. 315. But, if only as much, then we submit that the verdict is entitled to very great weight, and especially when the same Court which tries the case, presides over the trial of the issues, and refuses to set aside the verdict. 2 Story's Eq. Jur., § 1478.

*Glassell & Leigh* for Respondent Eaton.

The respondents were not holders of claims against an estate.

Each complaint alleged the existence of a partnership; and that the property in controversy was the property of the partnership.

The property in controversy was not the estate of the deceased partner, but the property of the respective partnerships.

The interest of each partner in the partnership property is his share of the surplus after the partnership accounts are settled and all just claims satisfied. 3 Kent's Com., 8th ed., 37; Collyer on Part., 4th Am. ed., § 125.

One partner, after the dissolution of a partnership, has no exclusive right to any part of the partnership funds until the partnership accounts have been settled, and a balance in his favor ascertained. Canfield *v.* Hard, 6 Conn., 180; 3 Kent's Com., *ubi supra.*

Upon the decease of one partner, his share of the movable stock and effects of the partnership, subject to the partnership debts, devolves to his personal representatives, who thereupon become, both at law and in equity, tenants-in-common with the surviving partners. Collyer on Part., 4th Am. ed., § 129; 3 Kent's Com., *ubi supra;* Story on Part., § 346; Gow. on Part., 3d ed., 351.

Real estate acquired with partnership funds, for partnership purposes, is, in equity, regarded as partnership property. Collyer on Part., 4th Am. ed., § 135, and notes; 3 Kent's Com., 8th ed., 38; Story on Part., §§ 92, 93. And this is so, *a fortiori,* when, as is alleged in the present case, it was a part of the business of the partnership to buy and sell real estate.

Notwithstanding a conflict in the authorities as to whether, upon the death of a partner, real estate so acquired is to be deemed in equity, for all purposes, personal estate, it is clear that it is so deemed as to the payment of partnership debts, the adjustment of partnership rights, and the winding up of the partnership concerns. Hoxie *v.* Carr, 1 Sumn., 173, 182, 183; Story on Part., *ubi supra;* 3 Kent's Com., *ubi supra.*

For these purposes, at least, real estate, belonging to a partnership is treated, in equity, as belonging to the partnership, like its personal funds, and disposable and distributable accordingly, however the title may stand at law, or in whosoever name or names it may be; and the parties in whose names it stands, as owners of the legal title, will be held to be trustees of the partnership, and accountable accordingly to the partners according to their several shares and rights and interests in the partnership as *cestuis que trusts,* or beneficiaries of the same. Story on Part., *ubi supra;* Collyer on Part., *ubi supra;* 3 Kent's Com., *ubi supra.*

And these principles are recognized by the "Act to Regulate the Settlement of the Estates of Deceased Persons." Stats. at

Large of 1851, chap. 124, § 198; Comp. Stats., 405; Wood's Cal. Dig., 411, Art. 2317.

In the case of Gray v. Gray et al., the alleged defects are :

That the affidavit of publication was not made by the printer, or his foreman, or principal clerk.

It appears that the affidavit of publication was made by the "clerk" in the printing-office. The inference is, that it was made by the sole, and, consequently, the principal clerk.

It is well settled that a substantial compliance with the requirements of such statutes is sufficient. See Phillipps on Ev., Pt. II. Cow. & Hill's Notes, 3d ed., 462.

In the case of Eaton v. Gray et al., the alleged defects are :

1. That the said order contains no direction to deposit a copy of the summons and complaint in the post-office;

2. That the affidavit for the said order showing that the defendant resided in the State of New York, should have shown either at what place in that State the defendant resided, or that the deponent did not know; and

3. That the affidavit of publication was made by a book-keeper.

We will consider the first and second of the alleged defects collectively.

The affidavit in this case complies fully with the requirements of § 30 Pr. Act, and the requisite facts appeared by the affidavit to the satisfaction of the Court.

But when the residence of the defendant is not known, publication of the summons in the prescribed mode alone is sufficient.

This matter is obviously confided to the sound discretion of the Court; and when the affidavit contains all the affirmative facts required by the statute, and is satisfactory to the Court, an Appellate Court surely will not declare the proceedings invalid because the affidavit omits to state negative facts, which the inferior Court did not require to be stated.

In Story on Partnership, §§ 72, 37, it is laid down that partnerships, at the common law, may be divided into three classes : universal partnerships, general partnerships, and limited or special partnerships; that by universal partnerships, we are to understand those in which the parties agree to bring into the firm all their property, real, personal, and mixed, and to employ all their skill, labor, services, and diligence, in trade or business, for their common and mutual benefit, so that there is an entire communion of interest between them; and that such contracts, although of rare existence, are within the scope of the common law. This classification, it is shown, was fully recognized by the Roman law.

In the case of Goesele v. Bimeler et al., 14 How. U. S., 589,

607, the Supreme Court of the United States decided that there is no legal objection to a universal partnership.

It is also contended that there can be no dormant partnership in the purchase and sale of real estate.

The authorities cited in support of this proposition show that the law is the reverse. See Story on Part., § 63 ; Pitts v. Waugh, 4 Mass., 424 ; Smith v. Burnham, 4 Sumn., 435. See, also, Collyer on Part., § 3, 4th Am. ed., and cases there cited; Ib., § 51, and notes and cases cited.

The counsel for the appellants contends that "the instrument set out in the complaint was not an agreement for a partnership, but simply a conditional sale to Eaton of one-fourth of the property, at the time owned by Gray, together with its accumulations."

It was, most clearly, an agreement for a partnership.

What constitutes a partnership?

A community of interest in the partnership property, and a community of profit in the partnership business. Collyer on Part., 4th Am. ed., § 3, et seq.; Story on Part., § 2, et seq.; 3 Kent's Com., 8th ed., 24 ; Champion v. Bostwick, 18 Wend., 183.

This instrument establishes a perfect community of interest in the partnership property, and a perfect community of profit in the partnership business.

In the cases now under consideration, a guardian ad litem for the infant was appointed by the Court, according to law. See Prac. Act, §§ 9, 10.

This guardian ad litem consented to the entry of the decree ; and the decree was thereupon entered by order of the Court.

Infants are as much bound by the conduct of those who conduct their case as adults, provided such conduct be bona fide. 1 Dan. Ch. Pr., 2d Am. ed., 210 top paging, citing Tillotson v. Hargrave, 3 Mad., 494.

BURNETT, J., delivered the opinion of the Court—TERRY, C. J., concurring.

The learned counsel for the appellants has made several points, some of which apply to both causes, and others to only one.

But before we proceed to examine the points made by the appellants, we must first dispose of the motion made by the plaintiffs to dismiss the appeal upon the ground that it was not taken within the time limited by the statute. The fate of the motion depends upon the question whether the decree rendered twenty-seventh of October, 1855, was interlocutory or final. If final, the appeal was too late. If interlocutory, the appeal was in time.

. The decree adjudges that a partnership existed between Eaton and the deceased, and a different partnership between

William H. Gray and the deceased; each partnership embracing all business and all property, real and personal, of the parties; and decides that the partnership of William H. Gray was subject to that of Eaton. The decree settled the proportionate interest of each partner, and directed an account of the partnership transactions to be taken by a commissioner appointed for that purpose. It was also ordered that when the commissioner shall have made his report, and the same shall have been passed upon by the Court, the commissioner should proceed to sell all the real and personal property of the partnership, allowing all of the parties to become purchasers if they chose.

In the case of Ray v. Low, 3 Cranch, 178, it was held that a decree for a sale of mortgaged premises, upon a bill to foreclose, was a final decree. The same doctrine is held in the case of Whiting et al. v. The Bank U. S., (13 Peters, 6.) So, in the case of Travis v. Waters, (12 John., 500,) it was held that a decree on a bill for a specific performance on the coming in of the Master's report as to the quantity of land to be conveyed and the payments made, directing the balance due to be paid, and the conveyance to be executed, was a final decree. So, in the case of Field v. Ross, (1 Mon., 133,) it was decided that a decree ascertaining the amount of complainant's demand, directing a sale and ordering the payment of costs, was final. The Court said that the sale "was only a ministerial act, to effectuate what was decreed."

But it will readily be seen that these cases do not come up to the circumstances of this case. In the cases mentioned above, the sum due to the party was specifically ascertained, and certain specified property directed to be sold. The acts necessary to carry the decree into full effect were clearly ascertained and specifically stated. In the present case, the fact of partnership, and original proportion of each partner in the partnerships, were settled; but the partnership accounts had to be taken, and the question, whether any of the real estate should be sold, and what portion, remained open. The decree had not ascertained any specific sum as due to any one or more of the partners. It was evidently not a final decree, but merely interlocutory. This decree was necessary before any accounts could be taken, and the present relative rights of the parties determined. The decree did not settle their *present* condition; but only the *original* terms of the partnership. It might turn out, upon the accounts being taken, that Eaton and William H. Gray had received their full share, conceding that the decree was correct as to the original terms of the partnership. In such case, no appeal would be necessary. (1 J. J. Marshall, 498; 4 Sum., 495; 6 How. U. S. C., 209; 8 Wend., 219; 1 Ral. V. R., 20; 2 Com., 571; 10 Whea., 502.)

Coming, then, to the points made by the appellants, the first

objection urged by them is, that the plaintiffs were holders of *claims* against the estate of Franklin C. Gray, deceased, and could sustain no suit in the District Court, unless they had averred and proved that they were presented to the administrator for approval or rejection. This was not done, and it is insisted that the District Court had no jurisdiction. This objection is fatal, if it be true that the plaintiffs were holders of *claims* against the estate.

The word *claim* is certainly a very broad term, when used in certain connections, and in reference to certain matters. Lord Coke truly says, that "the word *demand* is the largest word known to the law, save, only, *claim;* and a release of all *demands* discharges *all right of action.*" Chief Justice Nelson says : " the word claim is of much broader import than the word debt, and embraces rights of action belonging to the debtor, beyond those which may appropriately be called debts." 2 Hill R., 223.

But however broad may be the general meaning of this term, we must look to the statute to ascertain the sense in which it is *there* used.

The Statute to " Regulate the Settlement of the Estates of Deceased Persons " requires the executor or administrator to give " notice to *creditors* of the deceased, requiring all persons having *claims* against the deceased to exhibit them." (§ 128.) " That every claim presented to the administrator shall be supported by the affidavit of the claimant that the *amount* is justly *due*, that no *payments* have been made thereon, and that there are no offsets," etc. (§ 131.) That " every *claim*," when allowed, "shall be filed in the Probate Court, and be ranked among the acknowledged *debts* of the estate, to be paid in due course of administration." (§ 133.) That when " any claim shall be presented to the administrator or the Probate Judge, and he shall be willing to allow the same in part, he shall state in his endorsement the *amount* he is willing to allow. If the *creditor* refuse to accept the amount," etc. (§ 139.) So, if the executor or administrator is himself a *creditor,* his *claim* shall be duly authenticated. (§ 149.) He is required to return a statement of all *claims* against the estate which have been presented to him ; and " in such statement he shall designate the name of the *creditors,* the nature of each claim, when it *became due,* or will become due, and whether it was allowed by him. (§ 147.) In other sections of the act the word claim is used in the same manner. (§§ 150, 220, 222, 228 to 249.)

It would seem to be clear, from the different sections of the act, taken and construed together, as well as from the nature and reason of the case, that the words *claimant* and *claim* are used as synonymous with *creditor* and *legal demand for money,* to be paid out of the estate.

But it was not the scope and purpose of these suits to establish

claims against the estate to be paid out of it in due course of administration. Conceding the allegations of the complaints to be true, the surviving partners were entitled to the possession and management of the partnership effects; and the only interest that the heirs could have in the partnership assets, was the net interest of their ancestor, after the partnership debts were all paid. It was necessary to file the bills, and make the administrator, the widow, and the infants, parties, for the reason that the real estate stood upon the record in the name of the deceased. In the theory of our system the estate of the ancestor, personal and real, vests in the heir, subject to the possession and lien of the administrator for the payment of debts and the expenses of administration. As the real estate was held in the sole name of the deceased, and the administrator had possession of the personal property, the whole belonged, *prima facie*, to the estate. To rebut this *prima facie* ownership and right to possession, and legally vest the property in the partnership, it was necessary to bring these suits. The primary object was to obtain the control of the partnership property, and the sale of so much of it as would be required to pay the partnership debts and for a partition of the remainder of the real estate, if any. These complex objects could only be accomplished by proceedings in the District Court. The Probate Court had no judicial means to do this.

The second objection made by the appellants is, that the Court had no jurisdiction of the person of Franklina C. Gray. In the case of Gray v. Eaton and others, the affidavit of publication was made by " L. Humphreys, clerk in the office of the Placer Times and Transcript," when the statute requires the affidavit to be made by the *principal* clerk. But this objection is not well taken, as it is clear from the affidavit that there was but one clerk in the office. When there is but one clerk his affidavit must be sufficient, and it is unnecessary for him to improperly describe himself as *principal clerk.*

In the case of Eaton v. Palmer and others, the affidavit of Eaton states that Mrs. Gray and child were residents of the State of New York, but does not state in what portion of the State they resided, nor that the affiant was not informed of, or did not know the fact. In the amended complaint of Wm. H. Gray, in the case of Gray v. Eaton and others, the fact is stated that Mrs. Gray and child resided in Brooklyn, in the State of New York. The plaintiff Eaton then had notice of the place of residence of the two defendants, and should have so stated in his affidavit. The result of his failure to state this fact, was that the Court did not direct a copy of the complaint and summons to be deposited in the post-office. This defect was not cured by the appearance of the mother in her own behalf. The twenty-ninth section of the Practice Act requires the service of the summons when the

41

suit is against a minor *under* the age of fourteen, to be made by delivering a certified copy of the summons and complaint to the infant *personally*, and *also* to his father, mother, or guardian. When the infant is over the age of fourteen, the service is only to be made upon him, as he may choose his own guardian. As the statute requires personal service of the summons upon the infant, although under the age of fourteen, it is clear that a copy should have been put into the post-office directed to the infant in the same manner as if over the age of fourteen. The Court had no right to appoint a guardian *ad litem* until the infant was properly brought into Court.

We are compelled to give the twenty-ninth section of the Code this construction, although there may seem to be no good reason for requiring personal service upon a minor under the age of fourteen. The language of the second subdivision is too clear to admit of any doubts; and it is not our right to make, but only to construe, the statute. (Sed. on Construction, pp. 293, 395, 306, 309, 311, 379.) In the New York Code, the service was only required to be made upon the guardian when the minor was under the age of fourteen. (§ 113, First Rep. of Com., 134.) In the act of April 22, 1850, (Statutes of 1850, 430,) the same provision as that contained in the twenty-ninth section of our Code is found, with a slight difference in the grammatical structure of the sentence. So, in the Practice Act of 1850, personal service was required upon a person of unsound mind, as also upon his guardian; while in our present Code, the personal service upon the lunatic is dispensed with. These facts show that the provision requiring personal service upon the minor under the age of fourteen, and also upon his guardian, is not the result of a misprint or a clerical mistake, but the deliberate will of the Legislature. As such, it is our duty to carry it out.

The third objection made by the appellants is, that the complaints do not allege the existence of such a partnership as to entitle the plaintiffs to file a bill *as partners;* and it is questioned whether there can exist such a relation as a *universal partnership.*

The question in this case regards the rights of partners as between themselves. A partnership, as between the partners themselves, may be defined to be a contract of two or more persons to unite their property, labor, and skill, or some of them, in the prosecution of some joint and lawful business, and to share the profits in certain proportions.

In most partnership agreements there is a stipulation to share the profits and bear the losses, in certain proportions. But if parties are so disposed, they are competent to agree that all the partners shall participate in the profits, while a portion shall bear all the losses of the original capital. If, for example, A, B, and C, should agree that A and B should put in the sum of $10,000 each, and C, the sum of $20,000; and that all the partners should

give their personal attention to the partnership business, and share the profits in equal proportions, but in case of any loss of any portion of the original capital, that loss should alone fall on A and B, there would seem to be no doubt of this being a partnership.

There can be no doubt, at this day, that a partnership may exist in the purchase and sale of lands. (Story on Partnership, § 83 ; Collyer, § 51, note.)    But such a partnership can only exist where the contract is reduced to writing. (Story, § 83.)   And it is not necessary that the partners should be jointly concerned in the *original* purchase, where the interests of the partners are afterwards mingled.    But the partners must, by the contract, be jointly concerned in the *future* sale.    (3 Kent, pp. 25, 26.

In reference to this subject, Mr. Justice Story remarks : " Nor is there in reality, as between the parties themselves, any difference whether the partnership property, held for the purposes of trade or business, consists of personal or moveable property, or real or immoveable property, or of both, so far as their ultimate rights and interests are concerned."

This language is very clear and distinct.   As *between the partners*, the partnership property may consist *either* of real or personal estate, or of *both*, and in each case their ultimate rights are the *same*.   And it does not matter in whose name the real estate may be held, he is only a trustee for the partnership, and the real estate, for the purpose of disposal and distribution, is to be treated as personal estate.    An exception may be stated, as where there are no partnership debts to pay, in which case the real estate should be partitioned, if practicable.    (§§ 92, 93.)    And this being the true character of partnership real estate, the surviving partner has an equitable lien upon it for his indemnity against the debts of the firm, and for the balance that may be due to him from the firm.   (Collyer on Part., § 135, and note.)   For the same reason, the widow and heirs have only an interest in the net partnership property, after all the partnership debts are discharged.

But it is insisted that there can not be a *dormant* partnership in the purchase and sale of real estate.   This objection would not seem to be well taken, as between the partners themselves there can be no difference, whether the business is commercial or dealing in real estate.   As between the partners and third persons, the law in regard to dormant partners will not apply ; (Pitts *v.* Waugh, 4 Mass. R., 424 ; 3 Kent, 31, note *a ;*) and we can see no reason why parties should not be competent to form a universal partnership.   There is nothing impracticable in it, or against morality or public policy.   Of course such a universal partnership would not be held to exist, unless the intention was clearly expressed.

It is also insisted by the learned counsel for the appellants, under his third point, that though it be conceded that Gray has

stated a case of partnership in his complaint, Eaton has not. The instrument claimed by Eaton to constitute articles of copartnership is set out in his complaint; and must constitute the sole evidence of the relation existing between him and the deceased. (Lee v. Evans, 8 Cal. R., 424.)

The effect of this objection depends upon the true construction of the instrument. The instrument is in an unusual form for partnership articles, and is only executed by the deceased. It purports, in the first part of it, to sell to Eaton one-fourth of all the real and personal property then owned by the deceased, or that might be owned by him within the next two years, or within the time the connection should continue, should it continue beyond the time specified. It was evidently an executory and not an executed contract. Eaton, on his part, was bound to remain with the deceased for two years; at the expiration of which period a division of all property, real and personal, was to be made, unless the parties should wish to continue longer. Among other conditions to be performed were these : " 2. That Eaton should unite all the funds he may hereafter become possessed of, in the joint fund, for the purpose of accumulation. 3. All outstanding debts shall be paid out of the joint fund held against the party of the first part." Taking the different portions of the agreement together, and we must conclude that the relation created by it was a partnership. 1. The contract was *executory*. 2. Gray put in all his property. 3. Eaton was to put all his future property into the joint fund, and also his time. 4. These were to be all put into the concern "*for the purpose of accumulation.*" 5. The debts were to be paid out of the "*joint fund.*" 6. A division of all the property was to be made—the one-fourth to Eaton, and the other three-fourths to the deceased. 7. The property to be divided consisted of that put in, with its *accumulations*.

The fourth objection urged by the appellants is that the decree was against the weight of evidence. This objection only applies to the case of Gray v. Eaton and others.

It is alleged by William H. Gray that written partnership articles were executed by the deceased and himself, but that the same were destroyed by the fire in June, 1851, in the city of San Francisco. It is certain, from the proof, that the two brothers were in partnership in a mercantile house in San Francisco. But this fact renders it the more probable that the partnership was confined to that house; and that the recollection of the witnesses had relation to that concern, and not to the alleged universal partnership. There is only one witness to prove the contents of the partnership articles, and his recollection does not seem to have been very distinct. The evidence to establish *such* a partnership, after the death of one of the partners, should be clear and full, and not subject to doubt. The circumstances, all

taken together, leave the greatest room for doubt.  We have examined the testimony carefully, and we can not resist the impression that the evidence did not warrant the decree.   It would be a greater labor than we can perform, consistently with the other business of the Court, to review the evidence in full in this opinion.

The other points made by the appellants are not important.  Our conclusion is, that the decree in the case of Eaton v. Palmer and others, so far as it affects the rights of the infant Franklina C. Gray, should be reversed, and that the decree in the case of Gray v. Eaton and others, should be reversed as to both the appellants, and cause remanded for further proceedings.