## MEAGHER ET AL. v. REED.

MINING COPARTNERSHIP — STATUTE OF FRAUDS NOT INVOLVED IN ACTION FOR SETTLEMENT OF ACCOUNTS AND DISTRIBUTION OF ASSETS. When the business of a partnership, organized to lease and operate a mine during a limited period for the sole purpose of making a profit through the extracting and marketing of ores therefrom, has been terminated in a suit brought by one of the partners to settle the partnership accounts and distribute the partnership profits and other assets, no interest in realty is involved. In such case the right to a settlement and distribution in no way depends upon the legal *status* of realty under the statute of frauds.

[*Per Reporter:* By the decision of this case, as announced by the court in its *per curiam*, some of the legal propositions discussed by Mr. Commissioner PATTISON are left undecided.]

| 14 | 335 |
| 3a | 270 |
| 14 | 335 |
| 22 | 49 |
| 22 | 557 |
| 5a | 372 |
| 14 | 335 |
| 23 | 164 |
| s23 | 524 |
| 14 | 335 |
| 24 | 282 |

*Appeal from District Court of Lake County.*

Messrs. TELLER & ORAHOOD and JOSEPH W. TAYLOR, for appellants.

Mr. J. B. BISSELL, for appellee.

PATTISON, C. This is an appeal from a judgment and decree rendered the 24th day of December, 1884, in a suit in equity brought by Clinton Reed, the appellee, to recover an undivided one-fourth interest in a leasehold estate in a certain lode mining claim, known as the "Felicia Grace," situate in the consolidated ten-mile mining district, Summit county, Colorado, and for an accounting of the proceeds realized by the appellants in working that property.

The suit was predicated upon an alleged partnership agreement between appellants and three other persons, who will be named hereafter, and the issues presented to this court are: *First,* whether the partnership was established by the evidence; and, *second,* whether such evidence was legal and competent.

The first question necessarily involves a review of the evidence taken upon the trial. In the consideration of the case, only so much of the bill of complaint need be recited as defines the contract between the parties and their several interests in the property, and the proceeds of the property in controversy. It is alleged that in the month of April, 1884, the defendant J. C. Meagher, the plaintiff Clinton Reed, A. A. Smith, and John Van Avery, by parol, entered into an agreement of copartnership, wherein and whereby it was agreed by and between the said several parties that they would together obtain a lease upon the property known as the "Felicia Grace" lode mining claim, and, after obtaining the lease of said property from the owners thereof, would together, as an association or copartnership, enter upon and into said mining property, and prosecute the work of developing

and extracting the ore therefrom under and by virtue of the terms of said lease, for the joint benefit, profit and advantage of said several partners. That by the terms of said agreement the interests of said several parties were to be as follows: The said Reed was to be and become the owner of one-fourth thereof, paying his proportion of the expense of working and developing said claim, and working it, and receiving such proportion of the profits thereof. That the said Smith was to own and enjoy in like manner one-fourth and the said Meagher one-fourth. That by the terms of said agreement so entered into between the parties said Meagher was to procure from the owners of the property the lease thereof in his own name, and after its procurement to execute to the said parties proper and sufficient transfer and assignment of their interests therein. That thereafter, and in the said month of April, A. D. 1884, in accordance with the said terms of said partnership agreement so entered into between the parties, the said Meagher procured from the owners of the said property, in his own name, a lease thereof, for the period of eighteen months from the day of its execution. That said lease was executed by the owners of said property on or about the —— day of April, A. D. 1884, and was thereafter duly recorded in the office of the recorder of deeds in Summit county, Colorado.

It is then alleged that after the execution and delivery of the lease, Meagher, on behalf of the copartnership, took possession, and began developing the property; that complainant, as he was bound to do, contributed materials and funds to aid in the prosecution of the common enterprise. It is unnecessary to state the other allegations of the complaint, such allegations being such as are usually found in a suit brought between partners for an accounting and distribution of partnership property.

The answer put in issue the allegations of the complaint, and interposed, as a separate defense, the statute

of frauds. The case was tried to the court. It is unnecessary to recite the findings of fact, except such as define the relation of the parties to each other, and constitute the basis of the decree. Such findings are as follows: "(1) In the fore part of April, 1884, the defendant John C. Meagher, the plaintiff, Clinton Reed, A. A. Smith and John Van Avery formed a copartnership for the purpose of procuring and working a lease on the Felicia Grace mine, situate in Summit county, Colorado; that each of said persons was to own an undivided one-fourth interest in said lease when the same was procured, and upon the suggestion of the defendant Meagher that he, being an owner of the property, could probably procure a lease on better terms than others, it was agreed that he should procure the lease in his own name, and after the procurement thereof should transfer to the other parties their respective interests, and until such transfer was made that he should hold their interests in his own name for their benefit. (2) That some time about the 24th day of April the lease was made, and on the 26th day of April Meagher and Patrick Barker, who succeeded to the interest of Van Avery in the premises, went to work. (3) Intervening the time when the agreement was made and the work commenced, Van Avery notified Meagher that he would not be able to take his interest in the lease. Thereupon, by agreement between Meagher and Barker and the other parties, Barker took that interest, an undivided one-fourth. (4) That such agreement and transfer was made prior to the time of the actual execution of the lease itself. (5) That on the 26th day of April work was commenced under the lease in accordance with the terms of the agreement antecedently made. That thereafter, on the 27th of April, as had been agreed, the defendant Meagher applied to A. A. Smith to furnish supplies under the copartnership arrangement. That on that day the plaintiff, Reed, sent Meagher the supplies asked for, amounting to the extent and value of $13.05,

which was received by Meagher, and by him used in the prosecution of the enterprise. (6) That afterwards, and about the 1st day of May, Meagher wrote to A. A. Smith for $25, to be used in the payment of the current expenses of the prosecution of the work. That the said sum so applied for was sent to him by the check of plaintiff, Reed. (7) That Meagher thereafter, and until the commencement of this suit, made no other request or application to Reed for other supplies or money to be used in and about the work. (8) That it was agreed at the time of the formation of the original copartnership arrangement with Meagher that the several parties were to contribute whatever supplies and money might be needed in the prosecution of the common enterprise only, and whenever they should be called for by Meagher for their proportion of the expenses." The other facts found by the court do not appear to be material to the discussion of the case.

By the twenty-third finding it is declared that the said lease will by its terms continue until October 24, 1885; that there has been opened in the said premises a large and valuable body of ore; that the developments show that during the continuance of the lease there will probably be taken, mined and removed from the said premises upwards of three thousand tons, at the rate at which said mine is now being worked; and that the ore so mined will be of the probable value of $50 per ton, and of the net value of upwards of $100,000, of which the said Reed's share will be about $25,000.

By the twenty-fourth finding it is declared that the said Clinton Reed is now the owner of an undivided seven-thirty-seconds in the said lease, and entitled to that extent to share in the benefits and advantages accruing thereunder, and to that proportion of the profits of all the ores mined; and that he is entitled to occupy, possess and enjoy the said premises under the said lease with the said Meagher and the other defendants interested in said lease.

If these findings are sustained by legal and competent evidence, it is clear that the judgment and decree based upon them must be affirmed.

It is first necessary, therefore, to determine by a re-view of the entire case whether the findings of the court are warranted by the facts disclosed and established by the evidence. The evidence tends to prove that for some time prior to April 1, 1884, the appellant J. C. Meagher was one of the owners of the property in question. The property was undeveloped and its value unknown. A shaft had been sunk upon the premises to a considerable depth, but no valuable deposit of mineral had been found. In an adjoining property, known as the "Robinson Lode Mining Claim," a deposit of mineral had been discovered some time before, the dip or direction of which was to-wards the "Felicia Grace." Meagher having learned of this discovery, and believing that the same deposit or a continuation of it might be found within the territory of the property named, became desirous of securing a lease from his co-owners for the purpose of developing the property and ascertaining whether this deposit of mineral could be found. Being without means it was essential for him to associate others with him to aid in the enter-prise. Some time in the month of March, 1884, Meagher met at Leadville one Dr. A. A. Smith, and had some con-versation with him in relation to the matter. He suc-ceeded in interesting Smith, and obtained from him a promise that he would undertake to pay one-fourth of the expense of developing the property if a lease was ob-tained, in consideration of the transfer to him of an undivided one-fourth interest in the lease when it was made. In this conversation it appears that Smith sug-gested that Clinton Reed would also take a quarter inter-est and pay one-fourth of the expenses. Before the lease was actually obtained a definite understanding was ar-rived at between Meagher, Smith and Reed that Reed and Smith would each pay one-fourth of the expense of developing the property, in consideration of which

Meagher undertook to transfer to each of them an undivided one-fourth interest in the lease when obtained. At about this time Meagher had some conversation with one John Van Avery in relation to the property. Van Avery then thought that he might also be able to take an interest in the property, and undertook to furnish an engine to be used in its development, in consideration of the transfer to him of a one-fourth interest if the lease should be obtained. The remaining one-fourth was to be held by Meagher, in consideration of his obtaining the lease and giving his time and labor to the working of the property. Before Meagher succeeded in obtaining the lease Van Avery decided that he would not interest himself in the enterprise, and so notified Meagher. Thereupon one Patrick Barker became interested to the extent of one-quarter, but upon what terms the record does not clearly disclose. After these conversations were had with the several parties named Meagher succeeded in obtaining a lease of the property for the term of eighteen months. The lease is in form a mining lease, and bears date April 26, 1884. It was made by John A. Hall, Jr., Martin Warner, Henry Woodford, James Dorland, George McClusky, J. W. Woodford, C. F. Woodford, W. N. Clark, C. H. Pierce and A. W. Etter, as lessors, and John C. Meagher, as lessee. No money was expended by Meagher, or by any of the parties, to obtain the lease. No rental is reserved by the lease, except that by its terms the lessee covenanted to pay to the lessors, as royalty, fifteen per cent. of the price paid or contracted to be paid for any ore extracted from the claim.

After the execution and delivery of the lease it appears to have been delivered by Meagher to Smith, who seems to have retained it for a considerable time. It was recorded in the office of the clerk and recorder of Summit county, Colorado, May 20, 1884. After the lease was secured Meagher and Patrick Barker immediately entered into the possession of the property, and began the work

of development. The relation of the parties as disclosed by the record at this time was clearly defined. There seems to be no uncertainty as to the intention of the parties in the premises. The lease had been acquired as contemplated by the several parties in interest, and apparently in consummation of the understanding and agreement which had been entered into between them. When Meagher and Barker began the work of development there seem to have been four parties interested, and their respective interests seem to have been equal.

Attention is now called to so much of the evidence as relates to the conduct of the parties under the agreement after possession was taken of the mine. On April 27, 1884, the day after the date of the lease, Meagher addressed a letter to Smith as follows: "Robinson, April 27, 1884. A. A. Smith, Esq.: I started to work yesterday in the sixty-foot shaft. I find by the Robinson mine maps that the mineral in their tunnel is going straight for the Felicia Grace. I was in to see the new strike, and I think it is going to be as big an ore-shoot as the old one. It is ten feet high, and can't tell how wide. John Hall was here and signed one copy of the lease. The other he will sign and send back. Sent it to him three or four days ago. I have taken this man Barker in. He is working with me here. I will have to put on another man. It will take three men to work this shaft. It is only about one hundred and twenty-five feet from the Robinson mineral, so I think we will get it in forty feet more, and if the water don't stop us I think we will be able to get there in thirty days. If we get water we will have to put up an engine. The snow is four or five feet deep, so we will have a hard time to get an engine here. If you see Van Avery tell him not to go to any expense until he hears from me that other arrangements might be made. If you and Mr. Reed take half of the lease there will be no interest left for Van. George and I took one-eighth each, and Barker one-fourth. John

Hall says he can't take an interest, as he is hard run for money. I wish you would send me ten pounds of giant powder; two hundred feet fuse; one box giant caps; one box candles; two hammer handles; two picks. Please send the bill. Yours, respectfully, JOHN C. MEAGHER."

Between April 27th and May 10th Meagher addressed a letter to Smith, asking him for $25 to pay expenses. The letter was presented to Reed, who immediately gave his check for $25, which was sent to Meagher, inclosed in the following letter: "Leadville, Colo., May 10, 1884. My dear John: Yours reached me to-day, and I hand you herewith Clint's check for amount called for. I hope you will catch on to some pay soon. I will back you up to the best of my ability till I get some money which I am looking for every day. I will try to get up to see you some time next week. Do the best you can, and write me any new developments in the meantime. Clint has no faith in the thing, but if we find some then he will have more faith. Yours truly, A. A. SMITH."

The supplies above mentioned were purchased by Reed, and sent about May 3d. On that day Smith wrote Meagher as follows: "Leadville, May 3, 1884. My dear John: Yours reached me on Tuesday, and, owing to the excitement of the convention, was not attended to at once, and Clint struck out for Denver, and only returned this morning, when I proceeded to bounce him rough-shod, and have ordered the supplies, which will probably not reach you before Monday. As the express company will not take powder, it will have to go by freight. Clint and I take one-half of it. I think I will have plenty of money in a few days, and will not hesitate doing all in my power to push the work, and will not have to run Clint down every time anything is to be done. I regret the delay in your first order. You know I have always been prompt in our operations together heretofore. Let me hear from you. SMITH."

About the last of May it became necessary to obtain

an engine on account of trouble with water. Meagher left the mine and came to Leadville, and had some conversation with Reed in regard to this matter. Reed mentioned one or two engines which he thought he could obtain, but no definite arrangement was made. Meagher had an account showing the amount which had been expended in labor and supplies up to that time in the development of the property. The amount was $285.60, and the share of Reed was stated to be $71.40, less the $38.05 he had heretofore paid. Reed inquired of Meagher at the time whether he wished him to pay the balance then due from him, to which Meagher replied that he did not, as Reed would be compelled to incur expense in obtaining and sending the engine to Robinson. No engine was obtained by Reed at any time. On June 7th Meagher addressed the following letter to him: "C. Reed, Esq., Leadville, Colo.— Dear Sir: I have written to Dr. Smith to know what you have done about the engine, and have not received answer. It is about time that we had this shaft down, as the Robinson company is running an incline towards us night and day. Write, and let me know what you can do. Yours respectfully, J. C. MEAGHER." This letter was received by Reed, but was not answered. June 9, 1884, the following letter was addressed to Meagher by Smith: "Dear John: I saw Clint a minute on Saturday, and I have not seen him since. Just now learned that he went to Denver last night again, and will not return until Tuesday or Friday. I don't think that he wants to do anything, or that he means to. The question is as to what we can do under the circumstances. I am still unable to do anything of myself, and if Clint won't do anything that seems to cook my goose till I am in a position to act for myself. If you can sell us out you had better do so, and I will make Clint surrender. I have received no money yet, and of course cannot tell when I will. No man can regret my circumstances more than I do myself, for I be-

lieve it to be a good thing. Would like to hold on. Yours truly, SMITH."

It does not appear that Reed had any knowledge that a letter of this tenor had been written by Smith, or that he had authorized or suggested that any sale of his interest should be made. June 14th another letter was addressed by Meagher to Reed, as follows: "Dear Sir: Not hearing from you, I have made an arrangement for an engine which will answer for the present. I received a letter from Dr. Smith saying he would have to give up his interest. I am very sorry that he can't carry his interest, as I think it is a good lease and must stop the Robinson company from going through to the Champion ground. Mr. Hall is here and will take an interest in the lease, and I would like to know what you intend to do. I am not going to give up after spending what I have. Hoping to hear from you soon, I am very truly yours, J. C. MEAGHER. P. S. Please tell Dr. Smith to send the lease to me. J. C. M." This letter was not received by Reed until some time in July, nor until after a large body of mineral had been discovered in the property. It appears that he was absent continuously from Leadville, on professional business, from about June 16th until some time in July. June 16th Smith wrote the following letter to Meagher: "Dear John: I finally had an interview with Clint, and he don't seem inclined to do anything at all, and tells me to sell the thing out; and if I could do so for enough to pay what we owe I would be glad to have you do it. I have not received any money yet. Would be very glad to stay in and put up, but I don't see how I can at present. Clint is going east soon — liable to leave on any train — to be gone a week or two. Can you see any chance to do anything? Let me hear from you at once. SMITH."

In relation to this letter Reed testified that he never had the interview with Smith mentioned, and that he never authorized Smith to direct Meagher to sell his in-

terest in the property. On June 12, 1884, Meagher addressed the following letter to Barker: " P. Barker, Esq., Leadville, Colo.— Dear Sir: I have been working on the lease since I returned, fixing for an engine, but the engine has not been shipped yet, and there is no telling when it will. The doctor did not get his money yet, and is unable to pay his part. I was to see Rice's engine yesterday, but it can't be got out of the snow for two or three weeks yet; so the only thing I can do is to work the shaft by hand until I can get an engine of some one here, as we can't get the one in Leadville without paying for it, and that we can't do at the present time. The water is about twenty feet from the top of the shaft, but I think we can hoist it out in three or four days, and then we may be able to keep it down easier than when we worked it before. I would like to hear from you as to what you think of the situation, and if you are coming back to work, or what you intend to do. You know I must work or give up the lease. I can get men here who will work for $3 a day, but they must be paid at the end of each week or they will not work. Or their pay must be guarantied by some responsible person. Hoping to hear from you soon, I am very truly yours, J. C. Meagher." Smith never contributed any part of his share of the expenses. After June 14th, the date of his last letter, he seems to have relinquished all interest in the enterprise. Barker worked twenty-eight and one-half days, and then left the property and never returned. He appears to have transferred his interest to John A. Hall, one of the appellants.

After the conversation between Reed and Meagher in May, no demand appears to have been made upon Reed for money or supplies. No communication seems to have been had between them except the two letters of June 7th and June 14th, in which Meagher asks Reed what he is going to do in relation to the engine. Neither does it appear that Reed ever offered to contribute either money or supplies after that conversation was had. As

has already been stated, he was absent from Leadville during the greater part of June and July, and had no knowledge of the transactions in relation to the property hereinafter mentioned. It seems to have been his understanding at the time this conversation was had that there was so much snow at the mine that an engine could not be shipped at that time, and that Meagher should return to the property and perform the work necessary to prevent a forfeiture of the lease, as by its terms the suspension of the work for ten days would work such a forfeiture.

It further appears that after receiving the letter from Smith of June 16th Meagher began to dispose of interests in the property. On June 14th he made an arrangement with Samuel Rice and L. C. Swain to lease an engine, for which he was to pay $25 per month. Afterwards, on July 1st, being unable to pay the rental of the engine, he transferred an eighth interest in the lease to Rice and Swain for the use of the engine and other considerations. Other interests were transferred by him for small sums of money and labor. In July a very large and valuable deposit of mineral was uncovered. When Reed returned to Leadville he demanded his interest in the lease and in the proceeds of the property, which was refused. Thereupon this suit was brought.

Upon the foregoing statement the first question naturally presented is whether a copartnership was ever actually entered into between Meagher, Reed, Smith and Van Avery, as declared by the court below by the first finding. A marked distinction exists in law between an agreement to enter into the copartnership relation at a future day and a copartnership actually consummated. It is an elementary principle that a partnership in fact cannot be predicated upon an agreement to enter into a copartnership at a future day unless it be shown that such agreement was actually consummated. In the language of the text-books, the partnership must be

"launched." To constitute the relation, therefore, the agreement between the parties must be an executed agreement. So long as it remains executory the partnership is inchoate, not having been called into being by the concerted action necessary under the partnership agreement. It is undoubtedly true that a partnership *in præsenti* may be constituted by an agreement if it appears that such was the intention of the parties. But where it expressly appears that the arrangement is contingent, or is to take effect at a future day, it is well settled that the relation of partners does not exist, and that, if one or more of them refuse to perform the agreement, there is no remedy between the parties except a suit in equity for specific performance or an action at law for the recovery of damages, should any be sustained. It is clear, therefore, that the first finding of the court, to the effect that the parties named entered into a copartnership for the purpose of acquiring the property in controversy, and engaging in a mining enterprise thereon, is unsustained by the evidence and unsupported by the law. At best, the negotiations had between these parties constituted but an undertaking on their part to enter into a joint relation upon the terms proposed; if Meagher should obtain a lease satisfactory to them. The several parties named having never undertaken the project together, Van Avery having decided to withdraw, it follows that as between them the partnership relation never existed. 1 Bates, Partn. § 78; *Wilson v. Campbell*, 5 Gilman, 383; Pars. Partn. 6.

Appellants' counsel claim that the finding of the court declaring that Meagher, Reed, Smith and Van Avery entered into a copartnership is unsustained by the evidence; that the second finding, that Barker, by consent of the parties, succeeded to the interest of Van Avery, is in legal effect a finding that a partnership agreement was made and a partnership relation entered into, different from that alleged in the complaint as the basis

of the action, and that there was, therefore, a fatal variance between the complaint and the proof. This proposition is predicated upon the principle that the relinquishment or transfer of his interest by a partner works a dissolution of the partnership. This contention is based upon the additional assumption that the partnership alleged, the partnership proved, if any, and the partnership found by the court was a general partnership, and subject to all of the legal and equitable principles incident to a commercial partnership of the usual character. Admitting this to be true, it does not follow upon the facts proven that the withdrawal of Van Avery from the agreement could have produced the result for which appellants contend. The mere refusal of a party to perform an executory agreement and to enter into the partnership relation cannot effect a dissolution, nor be followed by any of the legal consequences of a dissolution, for the reason that an executory contract of this nature does not constitute a partnership. Until the partnership agreement is consummated any one of the parties may refuse to enter upon its performance, and such refusal will simply subject him to an action for damages. It follows, therefore, that before the agreement is actually executed one party may withdraw with the consent of the others and another be substituted in his place. The fact, therefore, that the first finding of the court is not warranted by the evidence is not material unless it can be said that the fact that the complaint alleged a partnership between Meagher, Reed, Smith and Van Avery, while the proof established only an executory agreement between them from which Van Avery withdrew and in which Barker was substituted, was such a fatal variance as to require that the judgment be reversed. Upon this proposition very little need be said. It does not appear that the question was ever raised except in this court. Such variance is not assigned for error. Proof of the facts, upon which the second find-

ing of the court was predicated, was not objected to except upon the ground that such proof was incompetent under the statute of frauds. This question, therefore, may be passed without further consideration.

The second question suggested is whether a partnership relation between Meagher, Reed, Smith and Barker was established by the evidence, and, if so, what was its nature? The lease bears date April 26, 1884, and seems to have been executed about that time. Prior to this time a clear understanding existed between Meagher, Reed and Smith as to the enterprise and their relations and interests in it. It was settled that Reed should take and carry the burden of an undivided one-fourth interest. The interest of Smith appears to have been the same. In the letter of April 27th addressed by Meagher to Smith it is stated that Barker was to have one-fourth. It appears that Barker and Meagher went to the property together and began work, and that after this time Hall came to Robinson and signed the lease. At the time the enterprise was set on foot, and prior to the execution of the lease, the four parties named seem to have undertaken to acquire a lease of the property in question, and to develop and work the same for the purpose of extracting the mineral therefrom, and to pay the expenses and share the profits, if any, in accordance with their respective interests therein. That this arrangement constituted a partnership between the parties cannot be doubted. What was the nature of the partnership? Was it a general partnership, and subject to all the incidents and principles of the law of partnership, or was it a mining partnership, as defined in the text-books and by the authorities?

In England and in America the operation of mines has long been considered a species of trade. The nature of the business, and particularly the necessity for the continuous operation of mines, the practical impossibility of each owner acting independently, and the consequent

necessity of community of interest in the conduct of the business, have induced a careful consideration by the courts, in the many cases which have arisen, of the principles of law and equity properly and legally applicable to the business of mining, and the relation of mine-owners to each other. The result has been the application to the relation of co-owners of mines, at least while engaged in their joint operations, of the principles of partnership law so far as such application has been essential to the successful prosecution of mining operations, and the protection of the rights and interests of the parties as between themselves and towards third persons. In law the owners of mines hold their property as joint tenants or tenants in common, and not as partners. The courts in applying the principles of the law of partnership to the relation of such owners, when conducting mining operations upon their property, have departed from the principles of the law of co-tenancy only so far as the nature of the business and the rights and interests growing out of the business and the remedies for their enforcement and protection have seemed to require. For this reason a mining partnership has been usually, if not always, considered and treated as a particular and not a general partnership. It is undoubtedly a general rule that when two or more persons acquire mining property solely or principally for the purpose of extracting the ores, in the absence of an express intention to enter into a general commercial partnership in the conduct of their mining operations, the relation existing between them in the transaction of their common business is a mining partnership, and not a general partnership. 1 Bates, Partn. § 163.

In this case the principal if not the sole object of obtaining the lease of the "Felicia Grace" was the extraction of ores from the property. It is claimed by appellants that the partnership alleged in the complaint and found by the court is a general or commercial partnership,

which would be necessarily dissolved by the transfer of the interest of any one of the parties. It is clear that this position is untenable unless the evidence clearly establishes the fact that it was the intention of the parties to enter into such a relation. That there is no such evidence is apparent. Neither is there any fact or circumstance upon which the conclusion that such was the intention of the parties can be predicated. The relation, therefore, between Meagher, Reed, Smith and Barker, when the lease was obtained and at the time and after the work was begun, was that of a mining partnership, the members of which were changed from time to time as the work went on. In Collier on Mines (star page 88) it is said: "A question of some nicety sometimes arises whether persons working mines are trading partners or mere joint occupiers of the land, using the minerals as part of its produce. The result of the cases on this subject (some of which are somewhat conflicting) may be stated to be that this question will turn on the consideration whether the land be obtained wholly or principally for the purpose of trading in the ore, or whether the selling of the ore be only incidental or appurtenant to the occupation of the land. Where, however, companies of adventurers have been formed for the purpose of mining, and obtained leases either of the land or the minerals, or license to work in pursuance of that object, the courts of equity have long since recognized such associations as a species of trading partnership." Again, at page 89, it is said: "The dissolution of partnerships so numerous by death, bankruptcy, outlawry, or felony of any one partner, would have been incompatible with that continuous working of a mine which is necessary to success. It would have been highly inconvenient if no partner had been allowed to part with his share without the consent of each of his copartners. Moreover, the spirit of speculation and adventure, without which concerns so hazardous as those of mining would seldom be

commenced or persevered in, and the fluctuating nature
of the property, indicated the expediency of a ready
transferability of shares. Again, it would have been
somewhat hard upon the mining adventurer if each of
his associates, whom he had not the means of selecting,
had power to bind him by engagements with the public
as extensive as those of partners in ordinary trading
concerns. Accordingly, mining partnerships were early
recognized as differing from ordinary trading partner-
ships in not being founded on *delectus personæ*, from
which principle the rights and obligations of ordinary
trading partners are mainly derived. It was decided,
after many doubts, that the mining partner had a right
either to relinquish or transfer his share without the
consent of his copartners, and that upon his death or
bankruptcy the law, instead of dissolving the partner-
ship, would transfer it to his executors or assignees, and
the power of partners to bind each other by engage-
ments entered into with non-partners were restricted."
Finally, the author, after reviewing numerous cases, at
page 125 says: "The result of the foregoing cases may
perhaps be thus shortly stated: That a mining company
is a trading partnership, a share of which may be ac-
quired without such a conveyance as is necessary to pass
an interest in land; that it differs from ordinary trading
partnerships in not being founded on the *delectus per-
sonæ*, a difference which limits the powers of mining
partners; that the mere constitution of such a company
is no evidence of an implied authority from one partner
to another to pledge his credit by drawing bills of ex-
change or borrowing money, even on the greatest emer-
gency; that such constitution is, however, evidence for
the jury of authority to order necessaries on credit; that,
wherever there is any question for the jury of implied
authority, either to a mere partner or to a manager, the
proper direction to them is to consider whether it be

proved that such authority is necessary to the carrying on of the concern or usual in similar concerns."

These principles have been recognized again and again by the courts of England and this country. *Crawshay v. Maule*, 1 Swanst. 495; *Fereday v. Wightwick*, 1 Russ. & M. 45; *Williams v. Attenborough*, 1 Turn. & R. 70; *Dickinson v. Valpy*, 10 Barn. & C. 128; Colly. Partn. §§ 801, 808; 1 Bates, Partn. § 163; *Charles v. Eshleman*, 5 Colo. 107; *Manville v. Parks*, 7 Colo. 128; *Skillman v. Lachman*, 23 Cal. 199; *Duryea v. Burt*, 28 Cal. 569; *Kahn v. Smelting Co.* 102 U. S. 641; *Bissell v. Foss*, 114 U. S. 252, 260; Rock. Mines, 574; *Lamar v. Hale*, 79 Va. 147.

The cases cited not only clearly define the nature of a mining partnership, and distinguish such a partnership from a general partnership, but they also show that, except in the particulars mentioned, the affairs of a mining parnership are governed by the same principles in equity as a general partnership. In no case does this appear more clearly than in *Fereday v. Wightwick, supra:* " A lease was taken of certain mines, the lessees consisting of six persons; at the same time a lease was taken of the surface of the property. The mines and surface were used with a communion of expense and a communion of profit. The first question is whether this is a partnership property liable to be sold and disposed of to pay the partnership debts, and whether, a partner having sold part of his shares, his interest is to be considered subject, in the first place, to repayment of what is due from him to the partnership. This question is concluded by authority, but I am willing to decide it upon principle. Mining concerns are to some purposes trading concerns, but they are not so to all. They are not so in this particular, viz., that they are not, as an ordinary partnership trade, subject to dissolution on the death or bankruptcy of any of the partners, and the shares are

transferable without the consent of the partners. In these particular instances, they have not all the incidents of a trading concern. In other respects, it has been repeatedly held that they have. Now, it is a universal principle in regard to all property, whether real or personal, acquired for the purpose of a partnership, that property so acquired is, upon the dissolution of the partnership, subject to sale and accounts between the partners, and to payment of the partnership debts. That is a universal principle.

" To apply the rule to this particular case, the property was acquired by these partners for the purpose of the partnership concern. Therefore, though in the nature of real property it is subject to all the debts of the partnership, and subject to the debts of one of the partners incurred in the administration of the property, there can be no doubt that the plaintiffs have a right to make this claim." These principles are clearly stated and elaborated in *Duryea v. Burt, supra.* The relation, then, which existed between the parties before and at the time appellant Meagher obtained the lease of the property in question, was that of mining partners. The lease having been acquired by Meagher as one of the partners, pursuant to and in consummation of the partnership agreement, and the property having been applied to the uses of the partnership for the purpose of conducting the business of mining thereon, the interest in the property, to wit, the leasehold estate, must be deemed to be partnership property.

Third. That the interest in the premises acquired by the lease is an interest in lands, within the meaning of the statute of frauds, cannot be doubted. The question to be now determined is whether the arrangement or agreement between the parties, upon which the appellee predicated his rights in the premises, could be established by parol testimony. Can a copartnership entered into for the prosecution of a specific venture, necessarily re-

quiring the acquisition of an interest in a particular parcel of land, be proven by parol, or is such an agreement within the provisions of the statute of frauds of this state ? Gen. St. § 1515. That such a partnership differs very materially from a partnership entered into to trade in lands is manifest. Nevertheless, as the reasoning of the authorities maintaining the affirmative of the question would seem to apply to partnerships of either class, a review of the whole subject seems to be necessary. This precise question has never been presented to nor passed upon by this court. In the case of *Murley v. Ennis*, 2 Colo. 300, the agreement construed was stated by the court in the following language: "If two or more go into the public domain together to search and explore for mines, with the agreement to occupy and develop such discoveries as may be made for the joint benefit, and such discovery, development and joint occupation follow, it is clear that while each explorer becomes invested with his due share and estate in the premises no provision of the statute of frauds is violated. * * * But in the case supposed neither of the parties has at the date of the association any interest or estate which can be the subject of sale, and the contract of association does not contemplate that either shall part with any. Nor does the interest or estate which is afterwards acquired vest or inure by virtue of the agreement, but by the occupation and appropriation alone." Such an agreement is clearly distinguishable from that under discussion. The question was incidentally considered in *Kayser v. Maugham*, 8 Colo. 232, but was not involved in the decision of the case. The court said: "It is true that a trust in lands cannot be predicated upon proof of an oral agreement to create a partnership for the purpose of purchasing and handling or improving such lands, the partnership relation not having existed prior to the acquisition of title, and no partnership funds having been invested in the property. To recognize a trust in such

cases would be to abrogate the statute of frauds in this particular; it might as well be said that an oral contract providing directly for the purchase of an interest in lands is not obnoxious thereto. But the foregoing principle is not applicable to the case at bar, for the reason that here the partnership existed several months prior to the acquiring of title by defendants; that the partnership contract does not rest entirely in parol; and that the purchase of the mine was not contemplated by this contract."

The proposition actually decided is that contained in the last clause of the paragraph quoted. The counterpart of that proposition is that which is involved in this case, to wit, whether a partnership agreement to acquire a lease of a particular property for the purpose of extracting ores therefrom, made before the lease has been obtained, can be proved by parol, when it appears that it was acquired in the name of one of the partners pursuant to the agreement, and applied to partnership uses under the agreement. It is a well-settled elementary principle that if a partnership be proven to exist by competent evidence it may be shown by parol that a whole or a part of its assets consist of real estate. The real question now presented is whether the fact that the acquisition of a leasehold interest in the property in question was actually contemplated at the time the contract was made changes the rule of evidence so as to require that such contract be proven by an instrument in writing. It is also an elementary principle that a contract to enter into a copartnership in a business which requires the acquisition of an interest in land as a necessary incident to the business may be proven by parol. The question here presented is whether a parol agreement to acquire a leasehold interest in a particular mine, as a necessary incident to the development of the property, and the extraction of ores therefrom, is within the statute of frauds. The further question is also presented whether the fact that by the terms of the agreement the interest in the mine

was to be acquired by one, and the respective interests of the others transferred to them by him, in any wise change the rule applicable to the case. And finally, the general proposition is presented whether in this and in all cases of this nature the ultimate and only issue to be determined is not whether the property in controversy is or is not partnership property, within the meaning of the principles of partnership law. If this be found to be the real issue, then it necessarily follows that neither the statute of frauds nor the law of trusts has any application to the case. There is a very considerable conflict in the authorities bearing upon these questions.

Whether a partnership to trade in lands can be proven by parol has frequently been considered by the courts. The question has been discussed with great ingenuity, learning and ability by many able jurists, but, even when the authorities are in harmony, the reasons and principles upon which the decisions have been predicated are by no means the same. In many cases the law of trusts, with its doubts and uncertainties, has been invoked, and the issue determined by applying principles, the application of which was by no means certain. It has been assumed that for all purposes an interest in lands must be held by a title, either legal or equitable, within the meaning of the law. This is undoubtedly true; but to define this title it is not necessary to resort to the law of trusts. If the land is partnership property, the title is vested in the partnership, and is defined, governed and controlled by well-settled principles of partnership law; and this is true whether the title is vested in one of the partners, or in all.

A careful analysis of the more recent authorities clearly discloses a marked tendency to limit the issue to two independent propositions: *First,* is there a partnership? This may be proven by competent evidence. *Second,* of what does the partnership property consist? If of real estate, its treatment and disposition are regu-

lated by the principles of partnership law, without reference to the title or its character as realty. In Bates on Partnership, § 281 (the latest work on this branch of the law), the following language is found: "Real estate bought or leased with partnership funds, for partnership purposes, and applied to partnership uses, is deemed to be partnership property whether the title is in all the partners as tenants in common or in less than all, in the absence of any agreement. There is no necessity for any agreement in such cases. The statute of frauds has no application, but the title is held in trust for the firm. So of property originally contributed as stock, or if originally paid for by each out of his separate means, or brought into the use of the firm at its formation and subsequently agreed to be converted into partnership property, it becomes part of the capital." Is not this rule applicable to all cases where lands are purchased or leased for partnership purposes, whether the purchase of such lands or the leasing of the same was either an incident of the business of the copartnership or the express object for which it was formed? The same author, at section 301, says: "Where a partnership holds land, not as the chief purpose of its existence, but as an incident to the business, the statute of frauds does not apply, and the land may be shown to be a part of the partnership stock, and affected with partnership equities, by oral evidence. The partnership requires no writing to prove it, and exists outside of the ownership of real estate." Section 302: "The authorities are divided on the question whether a partnership to trade in lands may be proved by parol in order to affect the lands with partnership liabilities and equities. The preponderance is in favor of considering that the statute does not apply if the land was or is to be purchased with the joint fund, whether the title be taken in one or all." And, commenting upon the authorities cited in support of the text, the author defines the real question out of which the

conflict of authorities has arisen. "In those cases the partnership was formed to deal in land, and was not itself a transfer of the title, the land not being bought by the contract of partnership, but in pursuance of it, and out of the partnership funds. In the present class of cases the contract itself purported to be a transfer of interest."

In 1 Lindley on Partnership, 88, the author says: "With respect to that part of the fourth section of the statute of frauds which relates to lands, it is held (1) that a partnership constituted without writing is as valid as one constituted by writing; and (2) that, if a partnership is proved to exist, then it may be shown by parol evidence that its property consists of land." The opposite view is adopted by Judge Story in his work on Partnership. At section 83 he says: "But although there is no positive incompetency at the common law of creating a partnership in the buying and selling of lands on joint account, and for the benefit of the parties by way of commercial speculation and commercial adventure, yet such a contract must, from the nature of the case and the positive rules of law and the statute of frauds, be reduced to writing; and then the stipulations of the parties will constitute the sole rule to ascertain their intent and to enforce their respective rights."

Do the authorities sustain the principles of the author last cited? The leading case in support of this proposition is *Smith v. Burnham*, 3 Sumn. 435. In this case, after commenting upon the provisions of the statute of frauds, it is said: "Now, taking these clauses together, or separately, the same conclusion would seem to follow as to the parol agreement in the present case. If the agreement could be treated as a sale by the defendant to the plaintiff of any interest in the lands to be purchased, it would be within the statute. If it could be treated as the case of an estate created in lands, it would be a mere estate at will, which would defeat the whole intention of

the agreement and the whole object of the bill. I incline to think that it properly falls under neither of these predicaments, but that it is the case of the declaration or creation of a trust or confidence in lands, not arising or resulting by implication or operation of law. The trust arises *eo instanti* upon each purchase, and is then to attach, if at all. * * * It has been ingeniously argued that the interest of the plaintiff is in a moiety of the profits or proceeds of the sale, and not in the land itself, and that therefore, at least when the land has been sold by the defendant, the agreement attaches to the moiety of the proceeds. But the agreement, if good at all, attaches also to the land at the time of the purchase, and it is then an agreement for an interest by way of trust in the land, a sort of springing trust; and it is in virtue of this trust-estate, and of this only, that any right can attach to the moiety of the proceeds. The right to follow the proceeds is a right which, if it exists at all, flows from the interest in the lands, and the trust created in favor of the plaintiff. It is not collateral, but direct." Again he says, at page 461: "Then it seems clear that this is not the case of a resulting trust by implication or construction of law. It is not the purchase of an estate by one man in the name of another, where the purchase money is paid by the former, and the deed taken in the name of the latter. It is not the case of a purchase confessedly paid for out of the funds of an existing partnership for partnership purposes, and the deed taken in the name of one partner. In each of these cases a resulting trust will arise by operation of law in favor of the party or parties advancing the money. * * * The trust in the present case, if any there was, was one arising directly *ex contractu*, and not by implication or operation of law."

In the above case it will be seen that a contract of partnership entered into for the purpose of trading in lands is regarded as a contract in respect to an interest

in lands, within the meaning of the statute. It is assumed that such interest in land, or a trust therein, is transferred or created by the contract itself; that such interest or trust cannot be separated from the contract of copartnership; and that the issue in such cases is not alone whether a copartnership was entered into, but whether a copartnership was entered into the purpose of which was to acquire an interest in land. If such was the object of the agreement, then perforce of that fact it comes within the statute, and cannot be proved by parol.

This view of the question is adopted in a number of authorities, the most important of which is *Bird v. Morrison*, 12 Wis. 138. The court at page 155 say: "These cases, therefore, go no further than to establish three propositions: (1) Where real estate is bought with partnership funds for partnership purposes, there is a resulting trust in favor of the partnership, though the title be taken in the name of one. (2) Where the title is held by all the partners jointly, so as to be entirely consistent with the character of partnership property, the fact of partnership may be shown by parol, and that the property was held for partnership purposes, and from these facts the law will imply its partnership character, and such trusts as resulted therefrom. (3) A partnership in any branch of trade or business may be shown by parol as an existing fact, and then whatever real estate is held for the purpose of such business is regarded as an incident thereto, and the law will imply a trust in favor of the partnership, where the legal title is not in all." And, as an illustration of the application of the principle contained in the third paragraph quoted, he says, page 159: "If the bill had alleged that the partnership extended to the carrying on of a hotel business, that would have been a partnership, and might, so far as the hotel lots were concerned, have laid the foundation for applying the doctrine of implied trust to the real estate used for the hotel, as being incident to the business. But it only alleges

that they were to build a hotel, and this does not make
it a partnership, more than it would if they had built a
boarding-house or a mill." So far as the particular ques-
tion under discussion is concerned, the correctness of the
judgment under review might be rested upon the princi-
ples above stated alone. The acquisition of the lease was
but an incident to the business contemplated, to wit, the
extraction of the ores. The law would therefore neces-
sarily imply a trust for the benefit of the members of the
copartnership in the leasehold estate. But it is unneces-
sary to rest the case upon so narrow a principle, for the
reason, as it will clearly appear, that by the decided
weight of authority a partnership to deal in lands may
be established by parol. The leading case upon the sub-
ject is *Dale v. Hamilton*, 5 Hare, 369. The conclusion
arrived at, after prolonged argument and careful consid-
eration, is stated in the syllabus in the following lan-
guage: "A partnership agreement between A. and B.
that they shall be jointly interested in a speculation for
buying, improving for sale, and selling lands, may be
proved without being evidenced by any writing, signed
by or by the authority of the party to be charged there-
with within the statute of frauds; and, such an agree-
ment being proved, A. or B. may establish his interest
in land, the subject of the partnership, without such in-
terests being evidenced by any such writing." In *Fors-
ter v. Hale*, 5 Ves. Jr. 308, Lord Chancellor Loughbor-
ough observed, in response to the suggestion that the
question was whether there was a declaration of trust
within the statute of frauds: "That was not the ques-
tion. It was whether there was a partnership. The
subject being an agreement for land, the question, then,
is whether there was a resulting trust for that partner-
ship by operation of law. The question of partnership
must be tried as a fact, as if there was an issue upon it.
If, by facts and circumstances, it is established as a fact
that these persons were partners in the colliery, in which

land was necessary to carry on the trade, the lease goes as an incident. The partnership being established by evidence upon which a partnership may be found, the premises necessary for the purposes of that partnership are, by operation of law, held for the purposes of that partnership."

A like principle is laid down in *Essex v. Essex*, 20 Beav. 442. Attention is now particularly called to the language of the court in *Chester v. Dickerson*, 54 N. Y. 1: "On the other hand it is claimed that such an agreement is not affected by the statute of frauds, for the reason that the real estate is treated and administered in equity as personal property for all the purposes of the partnership. A court of equity having full jurisdiction of all cases between partners touching the partnership property, it is claimed that it will inquire into, take an account of, and administer upon all the partnership property, whether it be real or personal, and in such cases will not allow one partner to commit a fraud or a breach of trust upon his copartner by taking advantage of the statute of frauds." Citing cases. "I am inclined to think this doctrine to be founded upon the best reason and the most authority. * * * But suppose two persons by parol agreement enter into a partnership to speculate in lands, how do they come in conflict with the statute of frauds? No estate or interest in land has been granted, assigned or declared. When the agreement is made no lands are owned by the firm, and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands. While they are doing this, do they not act as partners, and bear partnership relations to each other? Within the meaning of the statute in such cases, neither conveys or assigns any land to the other, and hence there is no conflict in the statute. The statute is not so broad as to prevent proof by parol of an interest in lands. It is simply aimed at

the creation or conveyance of an estate in lands without a writing." Again, in the case of *Fairchild v. Fairchild*, 64 N. Y. 471, Church, C. J., uses the following language: "Real estate purchased as partnership property is not within the prohibition of the statute. In the first place it is not the case where the consideration is paid by one person, and a conveyance taken in the name of another. The consideration is paid by all. It is not, therefore, within the letter of the statute. But a more substantial reason is that property thus held is regarded as personal property, for the purpose of paying debts and adjusting the equities between the partners, and the individual member holding the legal title is a trustee for the partnership in respect to the property as personalty; and when the debts are paid and the claims of the several members as between themselves paid, the trust for the partnership is discharged, and a trust results to the other members of the firm, and the heirs of such as have died, in the remainder, by operation of law, which is saved by section 50 of the statute; and the holder of the legal title then becomes a trustee of such remainder, as real estate, for the benefit of persons interested." *Traphagen v. Burt*, 67 N. Y. 30; *Wormser v. Meyer*, 54 How. Pr. 189; *Bissell v. Harrington*, 18 Hun, 81. This same rule has been adopted in Indiana. *Holmes v. McCray*, 51 Ind. 358. Also, in *Bopp v. Fox*, 63 Ill. 540; *Wallace v. Carpenter*, 85 Ill. 590. In *Allison v. Perry*, 22 N. E. Rep. 492, decided in October last, the same court declares that "the law does not require that the agreement of copartnership shall be in writing to enable the firm to purchase lands. Where a partnership is constituted under a parol agreement, it may be shown that its property consists of land, and it may own, possess and enjoy the same."

In this case the partnership was entered into for the purchase of coal lands, and the development of the same, with a view to profit. This doctrine is adopted by the supreme court of Iowa in many well-considered cases.

*York v. Clemens,* 41 Iowa, 95. In *Richards v. Grinnell,*
63 Iowa, 44, it is held that, " while the decisions are con-
flicting, the decided weight of authority, as well as sound
reason and correct principles, supports the conclusions
reached in this case, that a contract of partnership for
the purpose of dealing in real estate is not void under the
statute of frauds because it is not evidenced by any writ-
ing, but rests in parol; and, after the dissolution of such
partnership, either partner may establish his interest in
the partnership without such interest being evidenced by
any such written contract." In the course of the opin-
ion Rothrock, C. J., says: " We think the cases above
cited are in accord with the decided weight of authority,
and in our opinion they are founded upon sound reason
and correct principles. It is everywhere held that, where
land is held by a partnership, it is, as between the par-
ties, and as to the creditors of the firm, to be treated as
personal property. Such being the law, it would seem
to follow that the statute of frauds can have no applica-
tion to lands thus held and owned." In *Pennybacker v.
Leary,* 65 Iowa, 220, Beck, J., says in the following lan-
guage: "It will be observed that the lands, as we have
before stated, were not purchased by the contract for the
copartnership, but by a subsequent purchase made in
pursuance thereof. The case, then, assumes the aspect
of the purchase of lands by a copartnership. While the
title of the lands was under this purchase vested in de-
fendant, they were really held by him in trust as part-
nership property. Plaintiff's interest in the lands is that
of a partner, as prescribed by the contract of copartner-
ship."

A like doctrine has been adopted by the supreme court
of California. In *Coward v. Clanton,* 21 Pac. Rep. 359,
in the course of the opinion, Works, J., says: "The de-
fendant contends in this court that, conceding that the
contract was one of partnership, as it was in parol, it
was within the statute of frauds, and cannot for that

reason be enforced.    It was held by this court in an early
case that a partnership the object of which was to deal
in real estate could not be formed by a contract resting
in parol.    *Gray v. Palmer*, 9 Cal. 616, 639.    The ques-
tion seems not to have been very thoroughly considered,
and the case is clearly against the great weight of author-
ity."    The same doctrine prevails in Oregon.    *Knott v.
Knott*, 6 Or. 142.    Also in Montana.    *Hirbour v. Reed-
ing*, 3 Mont. 13.    To the extent of holding that a part-
nership entered into to share the profits realized from
speculation in lands, the rule has been recognized in
Connecticut, Missouri and Minnesota.    *Bunnel v. Taintor*,
4 Conn. 568; *Snyder v. Wolford*, 33 Minn. 175; *Hunter
v. Whitehead*, 42 Mo. 524.    The numerous authorities
cited clearly establish the proposition that a partnership
entered into to trade in lands can be established by parol.
It therefore follows that the admission of the testimony
offered by appellee in the court below to establish a co-
partnership for the purpose of acquiring a lease of the
"Felicia Grace" and carrying on the business of mining
thereon was not error.

It has already been said that upon the facts proven the
nature of the partnership was that of a mining partner-
ship.    But whether it was a mining or a general partner-
ship is immaterial in the discussion of the question now
presented.    That question is suggested in the considera-
tion of the authority of Meagher to dispose of interests
in the lease.    For the purposes of this case it is not
necessary to determine to what extent the real estate
belonging to the copartnership is converted into personal
property, nor when, in equity, it ceases to be regarded
as personal property, and becomes real estate.    It is
sufficient to say that the real estate of a mining partner-
ship is, in equity, treated in precisely the same manner
as the real estate of a general or commercial partnership.
*Duryea v. Burt*, 28 Cal. 569, *supra*; *Settembre v. Put-
nam*, 30 Cal. 490.

Had Meagher any authority to transfer any interest in the leasehold estate except his own, without the authority and consent of his associates? If he could not, then it follows that the transfers made by him must be confined in their effect to his interests alone. This question is determined by principles so well settled as to be elementary. In Parsons on Partnership, p. 376, it is said: "No partner, and no proportion of the partners, can sell or transfer the real estate of the firm outright for money, or by way of mortgage to secure a debt, or to assignees in trust for debts, without the consent or authority of the other partners. On the first point, that he who happens to have the legal title cannot sell the real estate without the consent and authority of the rest, so as to give title to a grantee having notice, * * * we are quite sure that must be the law; and, if he make a mortgage to secure a debt or an assignment in trust for creditors by which the legal title would pass, it seems that equity will not sustain the transaction, even supposing it free from taint of fraud." 1 Bates, Partn. §§ 403–405.

Finally, it is contended that appellee abandoned his interest, and that Meagher had a right to treat the same as forfeited. This proposition is entirely untenable. There is no evidence to warrant it. The claim is predicated upon the fact that Reed failed to answer the letter addressed to him by Meagher on or about the 7th of June, and that for a period of less than six weeks he gave no attention to the enterprise. This is not sufficient to justify the conclusion that he had abandoned, or intended to abandon and forfeit, his interest. If in the month of July, 1884, instead of uncovering a valuable deposit of mineral, the parties had discovered that the property was absolutely barren, and had instituted an action against appellee for the contribution of his share of the expense, could he then have been heard to say, in defense of such an action, that he had abandoned the enterprise in the month of June, and that he was there-

fore not liable? Certainly not. The language of the chancellor in the case of *Hartman v. Woehr*, 18 N. J. Eq. 383, is suggestive in this connection: "They deny that he is or ever was a partner, on the ground that he has never complied with the partnership agreement by paying up his share of the capital. The position taken on their part is that until that is paid up he is not admitted as a partner. But this agreement was for a partnership to commence immediately and to continue for five years. The partners each agreed to pay in $10,000 of the capital, but it was not a condition precedent. The complainant, by his deed, paid up at the time of the agreement, $5,667 of his share, and the defendants accepted it, and used, and continued to use, the property in the partnership business. Neither of them paid up his share at that time, but at intervals of weeks or months afterwards; but the business of the partnership, the erecting of the brewery and manufacture of beer, went on. Each contributed some capital and labor. The existence of a partnership does not depend upon the fact that each partner has in all things complied with his agreement. If the contract has been made, property and labor contributed, and the partnership business commenced or carried on to any extent, there is a partnership. The defendants had a remedy if he did not comply with his engagement. They could have asked for a dissolution, and paid him back the amount he put in, and formed a new partnership. But under this agreement he was a partner for five years, unless the partnership was sooner dissolved." So in this case Meagher and his associates had the right to demand that appellee perform his agreement and contribute the share of the expense which he was obliged to contribute by the agreement. If he refused to comply with such demand then they might have assumed that the partnership was at an end so far as he was concerned. But no demand was made, except so far as such demand may be inferred from letters of June 7 and June 14, 1884.

But it affirmatively appears that these letters, except that of June 7th, did not reach the hands of Reed until some time in July, after Meagher had assumed that he had abandoned the enterprise, and had undertaken to sell his interest to other parties. Such conduct on the part of Meagher was entirely unwarranted by the circumstances, and in violation of appellee's rights in the premises.

Many other questions are suggested by the argument of counsel in this case, but it is not deemed necessary to consider them. Many findings of the court have been discussed by counsel for appellants with great ability, for the purpose of showing that they are not sustained by the evidence. It may be that some of them are unwarranted, but if the conclusions already reached are correct they are sufficient to sustain the decree. The judgment should be affirmed.

*Affirmed.*

RICHMOND and REED, CC., concur.

PER CURIAM. The principal purpose of the partnership, as stated in the exhaustive opinion of Commissioner PATTISON, was to carry on the business of extracting and marketing ores during the period specified. This purpose has been accomplished, and it only remains to settle the partnership affairs, and distribute the partnership assets. These assets include no interest in realty, and, in our judgment, the right to a settlement and distribution does not depend upon the legal *status*, under the statute of frauds, of such an interest. The judgment of the court below is accordingly affirmed.

ELLIOTT, J., dissenting.