## ABBOTT, PLAINTIFF IN ERROR, v. SMITH ET AL., DEFENDANTS IN ERROR.

1. RESCISSION—EVIDENCE.

When a rescission of a prospecting partnership contract is relied upon, the circumstances must show an absolute abandonment of the contract as to future enterprises. Proof of negotiations for an abandonment is insufficient to establish a rescission of the agreement.

2. PARTNERSHIP.

The existence of a partnership does not depend upon the fact that each partner has in all things complied with his agreement. If the contract has been made, property and labor contributed, and the partnership business commenced and carried on, there is a partnership.

3. MINING PARTNERS—AGENCY.

A contract to engage in the business of prospecting for and developing
mining property for the joint use of all, is in the nature of a part-
nership agreement, and under such an agreement, each party thereto
becomes the agent of the other in prosecuting the joint adven-
ture.

4. APPELLATE PRACTICE—INSUFFICIENCY OF EVIDENCE.

Where the verdict is clearly and manifestly against the evidence, it will
be set aside in furtherance of justice.

5. SAME.

Where the evidence does not tend to support the finding, the judgment
will be set aside as being against the evidence.

*Error to the District Court of Chaffee County.*

Messrs. LIBBY & MARTIN, for plaintiff in error.

Mr. G. K. HARTENSTEIN, for defendants in error.

RICHMOND, P. J., delivered the opinion of the court.

By the complaint in this case it is alleged that the plaintiff
in error, Abbott, and the defendants in error, Smith and
Creede, did, in the early part of the year 1885, enter into
what is commonly understood as a prospecting partnership
contract. Abbott and Smith were to contribute money and
supplies, and Creede to prospect and locate and work mining
claims ; and the claims located were to be located and recorded
in the names of Abbott, Smith and Creede jointly.

That on August 26, 1889, and while this contract was in
force and effect, Smith and Creede discovered and located
two mining claims called The Holy Moses and The Cliff.

That at the time of the discovery and location of these
claims, Smith and Creede were using food and other supplies
purchased with the partnership funds ; that they neglected
to include the name of Abbott in the discovery notice and
recorded certificate of location, as one of the owners of the
claim. On the contrary, they did include the name of E. R.
Naylor. Since that time Smith, Creede and Naylor have
sold the mining claims to the defendant in error, Moffat, for

the sum of $70,000, and have received and divided among themselves $11,000 of this sum; that a deed conveying the mining claims to Moffat is in escrow with The First National Bank of Salida, to be delivered to Moffat upon the deposit by him in said bank of the sum of $55,000. The financial irresponsibility of Smith and Creede is set forth. The purpose of the suit is for an accounting and for a decree adjudging Abbott to be the owner of one third of the mining claims, subject to the right of Moffat to complete his purchase, thus securing to Abbott a one third interest of the purchase price.

Creede and Smith answer, alleging the existence of the contract up to the 20th day of June, 1889, at which time it is insisted Abbott voluntarily withdrew from the partnership. No decree is sought against Moffat, and since the institution of the suit, claim against Naylor's interest has been abandoned. So that it can be said that Abbott seeks to obtain a decree adjudging to him the one third of the two thirds of the purchase price belonging to Creede and Smith.

The cause was tried to a court without a jury, against the protest of defendants, resulting in a finding favorable to them, and upon which judgment was entered. To reverse this judgment Abbott prosecutes this writ of error.

This case presents no unusual features. Such contracts have been productive of much litigation. The testimony shows that for a period of four years Abbott had continuously furnished capital for himself and Smith to Creede, aggregating the sum of $2,000; and that when the parties started on the prospecting tour which resulted in the location of the claims, they were amply provisioned and well supplied with tools purchased with funds furnished by Abbott, and that at the identical time of the location and the subsequent development of the property to the extent of showing that the mines were of some worth, they were sustained and assisted by the means thus provided. They had been prospecting in the location where the mines were discovered for several months prior to August 1889. In June, 1889, it seems that Abbott felt that he was being called upon for too much money, and

that Smith, who was obligated to furnish an equal portion of the funds was not doing his share.  He insisted upon a settlement, and Smith being unable to pay the money at the time of the settlement, executed his note, thus evidencing the amount of money due to Abbott.

Abbott testified that in the spring of 1885, the agreement was entered into, and that from that date up to the institution of these proceedings it was continued ; that Smith and himself were to furnish the funds to develop any property that Creede might find, paying him $1.50 a day and allowing him so much for grub; that Creede was to have one third interest in all claims located, Smith one third and Abbott one third; that in 1885 they located properties on the South Gunnison and Willow Creek, and that the yearly expenses incident to this enterprise amounted to between $350 and $400 each.

It is needless for us to give in detail the testimony of Abbott, it is sufficient to say that in substance it shows that he had visited the location where the mines were discovered, had inspected various properties previously located, and caused assays to be made, and done all in fact that Creede or Smith had required of him.  He positively asserts that the settlement of accounts relative to money advanced by him was not to be considered as an abandonment of his agreement, but only the result of a desire on his part of a settlement with Smith, to which Creede was in no sense a party.  The testimony of Abbott is certainly corroborated by letters of Smith. In this connection it must be borne in mind that Smith insists that the dissolution of partnership took place in June, 1889, yet the record shows that on October 20, 1889, Smith writes a letter to Abbott in which he says: " I wrote you some time since that Naylor and myself would visit our new find, and I would report on my return." * * * He gives a description of the vein, the character of the ore, and asks for advice in reference to the best method of transporting the ore from the mine to the railroad.  August 31, 1890, he writes another letter in which he says: "I received a letter from you, yesterday, and I judge from the date on it, it has been

traveling over the country for the last week. * * * I have been doing my level best to sell our mines over on Rio Grande, but up to date have failed.   Another party is after it now that I think will do some good, I shall start over tomorrow ; will be gone about ten days ; I will let you hear from me when I get back ; I tell you Chas. I am awfully anxious to sell it for I am in debt, consequently I am in misery."

It must be borne in mind that Creede was one of the partners, the one who was expected to find the property and to locate it in the names of all the parties.   He had been paid for his services and furnished with his provisions for a period of years ; he was then receiving his compensation from Abbott and Smith.   Abbott furnished the bulk of the money, and it nowhere appears in the record that Creede ever understood that Abbott was out.   Nor had there been any conversation with him concerning the matter.   In fact Creede fortifies the position of Abbott.   He testified that " I started prospecting for Smith, Abbott and myself in May, 1885 ; that in June, 1889, Abbott came across the range ; that he, Smith and Abbott went to Cascade Cabin and Spring Creek and Willow Creek ; that his understanding was at this time that he was to keep on prospecting in the same way he had been doing, and that this was the understanding of Abbott.   That Abbott had been sending him money for a couple of years, and that he naturally looked to Abbott for money to carry on the business ; that Abbott never had sent him word that he had withdrawn from the partnership ; that Smith and Abbott left about the 13th or 14th of June, and that Smith joined him on Powder Horn, and they went prospecting south and were out eight or ten days.   On the first trip they located the Holy Moses mine, about nine or ten miles south from the cabin ; they had ten or fifteen days' supplies for two, and had no supplies, tools or powder except those purchased with money furnished by Abbott.   That he used partnership tools and powder on the Holy Moses, and supported himself with the provisions furnished from the same source, and that the first information he had received of the dissolution was from

Smith. In his cross-examination he says: I think in conversation Abbott claimed an interest perhaps a month before I discovered the Holy Moses. Smith was in camp and we were virtually together; that the grub in Cascade Cabin, when Smith came back was worth $75.00, the value of the tools that he and Smith took, $30.00 at a rough guess, and that when he staked The Holy Moses he did not think it was of any special value.

In addition to this it is shown that Abbott paid on July 12, 1889, succeeding the time when Smith claims that he had abandoned the partnership, for assaying ores from these mines, the sum of $24.50 and reported the result of the assays to Smith. There are other circumstances in the record, detailed in the evidence, which we think add additional strength to the contention of Abbott.

To rebut this, Smith testifies that Abbott voluntarily retired and declared that he would have nothing further to do with Creede, and exhibits a letter written by Abbott subsequent to the location of the mine, wherein some expressions are used calculated in an indirect way to support his testimony. But we are certainly of the opinion that after the discovery of the mine, even up to so late a date as October of the same year, Smith did not believe that Abbott had withdrawn from the partnership; if he did, it is singular he should speak of the property in his letters to Abbott as our property; that he should advise him that *he would report on his return from his prospecting tour*, and should treat him as one who was entitled to information concerning the operations of himself and Creede. Abbott's explanation of his letter is certainly consistent with his contention. He says he did not mean to say he was out of the enterprise, but that he was done furnishing money for the time being, and that it was the duty of Smith to proceed with the enterprise and furnish such money as might be required in the subsequent prospecting.

The rule concerning the rescinding of such an agreement as is here under consideration is that the circumstances must

show an absolute abandonment of the contract as to future enterprises, and proof of negotiations for an abandonment is insufficient to establish a rescission of the agreement. The parties cannot treat the contract as binding and rescind it at the same time. *Chadbourne v. Davis*, 9 Colo. 581.

Accepting this rule as correct, and applying the evidence as we find it in the record, we are unable to concur in the conclusion reached by the court below.

The testimony does not show an absolute abandonment on the part of Abbott, but it does show that during the entire period up to and including the location of the mines, Creede as well as Smith considered Abbott as still interested in the prospecting enterprise. Creede positively asserts it and Smith absolutely admits it by his letters. And had the mines proven without value, or the prospecting tour fruitless, it cannot be doubted but that Creede at least, if not Smith, would have insisted upon Abbott's paying his proportion of the expenses including the sum due Creede for services. The evidence does not show that a demand on the part of Creede and Smith or by either of them was ever made upon Abbott, nor does it show that there was a necessity for so doing because of the fact that the supplies and tools then on hand were amply sufficient to carry on the enterprise up to the time when the location of the mines was made.

This case is somewhat similar to *Meagher et al. v. Reed*, 14 Colo. 335, wherein it is determined " that the existence of a partnership does not depend upon the fact that each partner has in all things complied with his agreement. If the contract has been made, property and labor contributed, and the partnership business commenced and carried on to any extent, there is a partnership." In this case as in that, we say defendants had a remedy. If he did not comply with his agreement, they could have asked for a dissolution, paid him back the amount he put in and form a new partnership ; they could have demanded the performance of the agreement, the contribution of his share of the expenses. But they had no right to assume that Abbott, who had furnished the money,—

not only his portion but that of Smith's—that because Abbott demanded a settlement with Smith he thereby dissolved the partnership between Smith, Creede and himself.

In the case of *Eagle et al. v. Bucher*, 12 Morrison's Mining Reports, 330, the court in passing upon a question similar to the one here under consideration used this language : " The principle relied upon by defendant's counsel, that a partnership may be dissolved by the act of one of the partners, we do not, in the view we take of this case, intend to impugn. That is too well settled to be now questioned. But to effect that purpose the act must be done with a view to its accomplishment. It should be communicated at once to the other members of the firm. They must be advised of the new relations created by the withdrawal of a member, or a transfer of his interests in the concern. Their future relations towards each other, and their pursuits of the particular enterprise, depend upon the acquisition of such knowledge."

This principle is directly applicable to the parties in interest, and supports the conclusion we have reached. In addition to this we may call attention to the fact that Creede was to do the prospecting for which he was to receive provisions and $1,50 per day, to be provided and paid by Smith and Abbott. This is their relation as shown by the record, and stands uncontradicted. It occurs to us therefore, that it matters little what Smith may have understood from Abbott, when Creede himself testifies that he considered Abbott in the enterprise and looked to him to furnish money under the agreement. And the record fails to show that Smith had ever furnished or was at the time of the location of these mines furnishing money or means wherewith to support or compensate Creede for his labor. This fact of itself makes it clear to our minds that if any individual name of this partnership should have been left out of the location, it should have been that of Smith rather than Abbott. At any rate, under the principle last recited, it cannot be said in the light of the testimony that the prospecting partnership had been dissolved. And we think that if Creede was fortunate in

his location, if his hopes were more than realized by his good luck, he ought to have borne in mind that the aid Abbott rendered him had mainly contributed to his good fortune—that in reality without Abbott and the employment of the means furnished by him to engage in the enterprise, the possibility of the discovery of the mines would have been very remote.

In *Boucher et al. v. Mulverhill*, 12 Morrison's Mining Reports, 350, the court in considering a prospecting contract, said : " There is no dispute but that said Barrette and Lowthier were the discoverers ; that plaintiffs furnished the money and provisions for some time before the discovery, to continue the prospecting for gold, and that they were living on these provisions when they made the discovery." And under these circumstances the conclusion of the court was that the parties were entitled to maintain their rights to their interests in the mines.

" An agreement to engage in the business of prospecting for and the development of lode mining property, for the joint use of all, is in the nature of a partnership agreement, and under such an agreement each party thereto becomes the agent of the other in prosecuting the joint adventure." *Lawrence et al. v. Robinson, et al.*, 4 Colo. 567.

The evidence, in our judgment, is wholly insufficient to support the finding of the court. And this conclusion therefore brings this case within the rule laid down by the supreme court of this state : " Where the verdict is clearly and manifestly against the evidence it should be set aside in furtherance of justice." *Keating v. Pedee*, 2 Colo. 526 : *Bugh v. Rominger*, 15 Colo. 452.

In *Cross v. Kistler*, 14 Colo. 572, the doctrine is announced that where the evidence does not tend to support the finding the judgment will be reversed, as being against the evidence.

In *Mitchell v. Reed, et al.*, 16 Colo. 109, the court uses this language : " It is the opinion of this court that the judgment was manifestly against the evidence, and is without the sup-

port from the testimony, which is not satisfactorily contradicted and explained."

Under these circumstances, however much the court may regret the necessity for a reversal, and whatever may be the pressure of the general rule restricting interference with judgments upon this court, it is obvious that in obedience to its conviction the case must be reversed.

The judgment is reversed and the cause remanded.

*Reversed.*